# NATIONAL LABOR RELATIONS BOARD *v.* WOOSTER DIVISION OF BORG-WARNER CORP.

No. 53. Argued November 20–21, 1957.—Decided May 5, 1958.*

---

*Together with No. 78, *Wooster Division of Borg-Warner Corp.* v. *National Labor Relations Board,* also on certiorari to the same Court.

*Dominick L. Manoli* argued the cause for the National Labor Relations Board. With him on the brief were *Solicitor General Rankin, Jerome D. Fenton, Stephen Leonard* and *Irving M. Herman.*

*James C. Davis* argued the cause for the Wooster Division of Borg-Warner Corporation. With him on the brief was *Robert W. Murphy.*

*Harold A. Cranefield* and *Lowell Goerlich* filed a brief for the International Union, United Automobile, Aircraft & Agricultural Implement Workers of America (UAW–AFL–CIO), as *amicus curiae.*

Mr. Justice Burton delivered the opinion of the Court.

In these cases an employer insisted that its collective-bargaining contract with certain of its employees include: (1) a "ballot" clause calling for a pre-strike secret vote of those employees (union and nonunion) as to the employer's last offer, and (2) a "recognition" clause which excluded, as a party to the contract, the International Union which had been certified by the National Labor Relations Board as the employees' exclusive bargaining

agent, and substituted for it the agent's uncertified local affiliate. The Board held that the employer's insistence upon either of such clauses amounted to a refusal to bargain, in violation of § 8 (a)(5) of the National Labor Relations Act, as amended.[1] The issue turns on whether either of these clauses comes within the scope of mandatory collective bargaining as defined in § 8 (d) of the Act.[2] For the reasons hereafter stated, we agree with the Board that neither clause comes within that definition. Therefore, we sustain the Board's order directing the employer to cease insisting upon either clause as a condition precedent to accepting any collective-bargaining contract.

Late in 1952, the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, CIO (here called International) was certified by the Board to the Wooster (Ohio) Division of the Borg-Warner Corporation (here called the company) as the elected representative of an appropriate unit of the company's employees. Shortly thereafter, International chartered Local No. 1239, UAW–CIO (here called the Local). Together the unions presented the company with a comprehensive collective-bargaining agreement. In the "recognition" clause, the unions described themselves as both the "International Union,

---

[1] "Sec. 8. (a) It shall be an unfair labor practice for an employer—

.    .    .    .    .

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9 (a).

.    .    .    .    .

"Sec. 9. (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . ." 61 Stat. 140, 141, 143, 29 U. S. C. §§ 158 (a)(5), 159 (a).

[2] See § 8 (d) as set forth in the text of the opinion, *infra*, p. 348.

United Automobile, Aircraft and Agricultural Implement Workers of America and its Local Union No. 1239, U. A. W.–C. I. O. . . . ."

The company submitted a counterproposal which recognized as the sole representative of the employees "Local Union 1239, affiliated with the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America (UAW–CIO)." The unions' negotiators objected because such a clause disregarded the Board's certification of International as the employees' representative. The negotiators declared that the employees would accept no agreement which excluded International as a party.

The company's counterproposal also contained the "ballot" clause, quoted in full in the margin.[3] In sum-

---

[3] "5. RESPONSIBILITIES OF THE COMPANY AND THE UNION

"5.4 It is agreed by both the Company and the Union that it is their mutual intent to provide peaceful means for the settlement of all disputes that may arise between them. To assist both parties to carry out this intent in good faith, it is agreed that it is essential that three basic steps be taken with respect to each dispute, in order to permit the greatest opportunity for satisfactory settlement: such steps shall include (1) a clear definition of the issue or issues, officially made known to all employees in the bargaining unit; (2) a reasonable period of good faith bargaining on the issues as defined, after such issues have been made known to all employees in the bargaining unit; and (3) an opportunity for all employees in the bargaining unit to vote, by secret, impartially supervised, written ballot, on whether to accept or reject the Company's last offer, and on any subsequent offers made.

"5.5 It is mutually agreed that the definition of issues referred to in Section 5.4 will include the proposals and counter-proposals of each party; that the reasonable period of good faith bargaining referred to in Section 5.4 shall be at least 30 days, with full discussion of the issue taking place during that period; and that the secret written ballot referred to in Section 5.4 shall be supervised by a representative of the United States Mediation and Conciliation Serv-

mary, this clause provided that, as to all nonarbitrable issues (which eventually included modification, amendment or termination of the contract), there would be a 30-day negotiation period after which, before the union could strike, there would have to be a secret ballot taken among all employees in the unit (union and nonunion) on the company's last offer. In the event a majority of the employees rejected the company's last offer, the company would have an opportunity, within 72 hours, of making a new proposal and having a vote on it prior to any strike. The unions' negotiators announced they would not accept this clause "under any conditions."

From the time that the company first proposed these clauses, the employees' representatives thus made it clear

---

ice, or by some other party mutually agreed upon by the Company and the Union. The Company and the Union further agree that such a ballot shall be taken on Company premises, at reasonable and convenient times, and with proper safeguards, similar to those observed in NLRB elections, being taken to insure freedom of choice and a fair election.

"5.6 It is further mutually agreed that if a majority of employees in the bargaining unit reject the Company's last offer, and the Company makes a subsequent offer within 72 hours from the time the results of the election are known, another secret, impartially supervised written ballot will be taken within the following 72 hours.

"5.7 It is further mutually agreed that the question of whether or not this Agreement is to be terminated is one of the issues subject to vote by such a secret, impartially supervised, written ballot.

"5.8 It is further mutually agreed that during the life of this Agreement the Company will not engage in any form of lockout, and the Union will not cause or permit the members of the bargaining unit to take part in any sit-down, stay-in, or slow-down, or any curtailment of work or restriction of production or interference with production, or take part in any strike or stoppage of any kind, or picket the plant, on any matter subject to arbitration, and not in any other matter, until all the bargaining procedure outlined in this Agreement, (including the Grievance Procedure, where applicable, and in all cases the three steps outlined in this Article), have been completely fulfilled." 113 N. L. R. B. 1288, 1310–1311.

that each was wholly unacceptable. The company's representatives made it equally clear that no agreement would be entered into by it unless the agreement contained both clauses. In view of this impasse, there was little further discussion of the clauses, although the parties continued to bargain as to other matters. The company submitted a "package" proposal covering economic issues but made the offer contingent upon the satisfactory settlement of "all other issues . . . ." The "package" included both of the controversial clauses. On March 15, 1953, the unions rejected that proposal and the membership voted to strike on March 20 unless a settlement were reached by then. None was reached and the unions struck. Negotiations, nevertheless, continued. On April 21, the unions asked the company whether the latter would withdraw its demand for the "ballot" and "recognition" clauses if the unions accepted all other pending requirements of the company. The company declined and again insisted upon acceptance of its "package," including both clauses. Finally, on May 5, the Local, upon the recommendation of International, gave in and entered into an agreement containing both controversial clauses.

In the meantime, International had filed charges with the Board claiming that the company, by the above conduct, was guilty of an unfair labor practice within the meaning of § 8 (a)(5) of the Act. The trial examiner found no bad faith on either side. However, he found that the company had made it a condition precedent to its acceptance of any agreement that the agreement include both the "ballot" and the "recognition" clauses. For that reason, he recommended that the company be found guilty of a *per se* unfair labor practice in violation of § 8 (a)(5). He reasoned that, because each of the controversial clauses was outside of the scope of mandatory bargaining as defined in § 8 (d) of the Act, the com-

pany's insistence upon them, against the permissible opposition of the unions, amounted to a refusal to bargain as to the mandatory subjects of collective bargaining. The Board, with two members dissenting, adopted the recommendations of the examiner. 113 N. L. R. B. 1288, 1298. In response to the Board's petition to enforce its order, the Court of Appeals set aside that portion of the order relating to the "ballot" clause, but upheld the Board's order as to the "recognition" clause. 236 F. 2d 898.

Because of the importance of the issues and because of alleged conflicts among the Courts of Appeals,[4] we granted the Board's petition for certiorari in No. 53, relating to the "ballot" clause, and the company's cross-petition in No. 78, relating to the "recognition" clause. 353 U. S. 907.

We turn first to the relevant provisions of the statute. Section 8 (a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees . . . ."[5] Section 8 (d) defines collective bargaining as follows:

"(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel

---

[4] *Labor Board* v. *Darlington Veneer Co.,* 236 F. 2d 85 (C. A. 4th Cir.); *Labor Board* v. *Corsicana Cotton Mills,* 178 F. 2d 344 (C. A. 5th Cir.). Cf. *Allis-Chalmers Mfg. Co.* v. *Labor Board,* 213 F. 2d 374 (C. A. 7th Cir.).

[5] See note 1, *supra*.

either party to agree to a proposal or require the making of a concession . . . ." 61 Stat. 142, 29 U. S. C. § 158 (d).

Read together, these provisions establish the obligation of the employer and the representative of its employees to bargain with each other in good faith with respect to "wages, hours, and other terms and conditions of employment . . . ." The duty is limited to those subjects, and within that area neither party is legally obligated to yield. *Labor Board* v. *American Insurance Co.,* 343 U. S. 395. As to other matters, however, each party is free to bargain or not to bargain, and to agree or not to agree.

The company's good faith has met the requirements of the statute as to the subjects of mandatory bargaining. But that good faith does not license the employer to refuse to enter into agreements on the ground that they do not include some proposal which is not a mandatory subject of bargaining. We agree with the Board that such conduct is, in substance, a refusal to bargain about the subjects that are within the scope of mandatory bargaining. This does not mean that bargaining is to be confined to the statutory subjects. Each of the two controversial clauses is lawful in itself.[6] Each would be enforceable if agreed to by the unions. But it does not follow that, because the company may propose these clauses, it can lawfully insist upon them as a condition to any agreement.

Since it is lawful to insist upon matters within the scope of mandatory bargaining and unlawful to insist upon matters without, the issue here is whether either the "ballot" or the "recognition" clause is a subject within the phrase "wages, hours, and other terms and conditions of employment" which defines mandatory bargaining. The "ballot" clause is not within that definition. It re-

---

[6] See §§ 201 (c) and 203 (c) of the Act, 61 Stat. 152, 154, 29 U. S. C. §§ 171 (c) and 173 (c).

lates only to the procedure to be followed by the employees among themselves before their representative may call a strike or refuse a final offer. It settles no term or condition of employment—it merely calls for an advisory vote of the employees. It is not a partial "no-strike" clause. A "no-strike" clause prohibits the employees from striking during the life of the contract. It regulates the relations between the employer and the employees. See *Labor Board* v. *American Insurance Co., supra,* at 408, n. 22. The "ballot" clause, on the other hand, deals only with relations between the employees and their unions. It substantially modifies the collective-bargaining system provided for in the statute by weakening the independence of the "representative" chosen by the employees. It enables the employer, in effect, to deal with its employees rather than with their statutory representative. Cf. *Medo Photo Corp.* v. *Labor Board,* 321 U. S. 678.

The "recognition" clause likewise does not come within the definition of mandatory bargaining. The statute requires the company to bargain with the certified representative of its employees. It is an evasion of that duty to insist that the certified agent not be a party to the collective-bargaining contract. The Act does not prohibit the voluntary addition of a party, but that does not authorize the employer to exclude the certified representative from the contract.

Accordingly, the judgment of the Court of Appeals in No. 53 is reversed and the cause remanded for disposition consistent with this opinion. In No. 78, the judgment is affirmed.

> No. 53—*Reversed and remanded.*
> No. 78—*Affirmed.*

Mr. Justice Frankfurter joins this opinion insofar as it holds that insistence by the company on the "recognition" clause, in conflict with the provisions of the Act

requiring an employer to bargain with the representative of his employees, constituted an unfair labor practice. He agrees with the views of MR. JUSTICE HARLAN regarding the "ballot" clause. The subject matter of that clause is not so clearly outside the reasonable range of industrial bargaining as to establish a refusal to bargain in good faith, and is not prohibited simply because not deemed to be within the rather vague scope of the obligatory provisions of § 8 (d).

MR. JUSTICE HARLAN, whom MR. JUSTICE CLARK and MR. JUSTICE WHITTAKER join, concurring in part and dissenting in part.

I agree that the company's insistence on the "recognition" clause constituted an unfair labor practice, but reach that conclusion by a different route from that taken by the Court. However, in light of the finding below that the company bargained in "good faith," I dissent from the view that its insistence on the "ballot" clause can support the charge of an unfair labor practice.

Over twenty years ago this Court said in its first decision under the Wagner Act: "The theory of the Act is that *free opportunity for negotiation* with accredited representatives of employees is likely to promote industrial peace and may bring about the adjustments and agreements which the Act in itself does not attempt to compel." *Labor Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 45. (Italics added.) Today's decision proceeds on assumptions which I deem incompatible with this basic philosophy of the original labor Act, which has retained its vitality under the amendments effected by the Taft-Hartley Act. See *Labor Board* v. *American National Insurance Co.,* 343 U. S. 395, 401–404. I fear that the decision may open the door to an intrusion by the Board into the substantive aspects of the bargaining process which goes beyond anything contemplated by the

National Labor Relations Act or suggested in this Court's prior decisions under it.

The Court considers both the "ballot" and "recognition" clauses to be outside the scope of the mandatory bargaining provisions of § 8 (d) of the Act, which in connection with §§ 8 (a)(5) and 8 (b)(3) imposes an obligation on an employer and a union to ". . . confer in good faith with respect to wages, hours, and other terms and conditions of employment. . . ." From this conclusion it is said to follow that although the company was free to "propose" these clauses and "bargain" over them, it could not "insist" on their inclusion in the collective bargaining contract as the price of agreement, and that such insistence was a *per se* unfair labor practice because it was tantamount to a refusal to bargain on "mandatory" subjects. At the same time the Court accepts the Trial Examiner's unchallenged finding that the company had bargained in "good faith," both with reference to these clauses and all other subjects, and holds that the clauses are lawful in themselves and ". . . would be enforceable if agreed to by the unions."

Preliminarily, I must state that I am unable to grasp a concept of "bargaining" which enables one to "propose" a particular point, but not to "insist" on it as a condition to agreement. The right to bargain becomes illusory if one is not free to press a proposal in good faith to the point of insistence. Surely adoption of so inherently vague and fluid a standard is apt to inhibit the entire bargaining process because of a party's fear that strenuous argument might shade into forbidden insistence and thereby produce a charge of an unfair labor practice. This watered-down notion of "bargaining" which the Court imports into the Act with reference to matters not within the scope of § 8 (d) appears as foreign to the labor field as it would be to the commercial world. To me all of this adds up to saying that the Act limits *effective*

"bargaining" to subjects within the three fields referred to in § 8 (d), that is "wages, hours, and other terms and conditions of employment," even though the Court expressly disclaims so holding.

I shall discuss my difficulties with the Court's opinion in terms of the "ballot" clause. The "recognition" clause is subject in my view to different considerations.

## I.

At the start, I question the Court's conclusion that the "ballot" clause does not come within the "other terms and conditions of employment" provision of § 8 (d). The phrase is inherently vague and prior to this decision has been accorded by the Board and courts an expansive rather than a grudging interpretation. Many matters which might have been thought to be the sole concern of management are now dealt with as compulsory bargaining topics. *E. g., Labor Board* v. *J. H. Allison & Co.,* 165 F. 2d 766 (merit increases). And since a "no-strike" clause is something about which an employer can concededly bargain to the point of insistence, see *Shell Oil Co.,* 77 N. L. R. B. 1306, I find it difficult to understand even under the Court's analysis of this problem why the "ballot" clause should not be considered within the area of bargaining described in § 8 (d). It affects the employer-employee relationship in much the same way, in that it may determine the timing of strikes or even whether a strike will occur by requiring a vote to ascertain the employees' sentiment prior to the union's decision.

Nonetheless I shall accept the Court's holding that this clause is not a condition of employment, for even though the union would accordingly not be *obliged* under § 8 (d) to bargain over it, in my view it does not follow that the company was *prohibited* from insisting on its inclusion in the collective bargaining agreement. In other words,

I think the clause was a permissible, even if not an obligatory, subject of good faith bargaining.

The legislative history behind the Wagner and Taft-Hartley Acts persuasively indicates that the Board was never intended to have power to prevent good faith bargaining as to any subject not violative of the provisions or policies of those Acts. As a leading proponent for the Wagner Act explained:

"When the employees have chosen their organization, when they have selected their representatives, all the bill proposes to do is to escort them to the door of their employer and say, 'Here they are, the legal representatives of your employees.' What happens behind those doors is not inquired into, and the bill does not seek to inquire into it." 79 Cong. Rec. 7660.

The Wagner Act did not contain the "good faith" qualification now written into the bargaining requirements of § 8 (d), although this lack was remedied by early judicial interpretation which implied from former § 8 (5), 49 Stat. 453, the requirement that an employer bargain in good faith. *E. g., Labor Board* v. *Griswold Mfg. Co.,* 106 F. 2d 713. But apart from this essential check on the bargaining process, the Board possessed no statutory authority to regulate the *substantive* scope of the bargaining process insofar as lawful demands of the parties were concerned. Nevertheless, the Board engaged occasionally in the practice of determining that certain contract terms urged by unions were conditions of employment and thereby imposing on employers an affirmative duty to bargain as to such terms rather than insist upon their unilateral determination, *e. g., Singer Mfg. Co.,* 24 N. L. R. B. 444, or conversely of determining that certain clauses were not conditions of employment and thereby prohibiting an employer from bargaining over

them.  *E. g., Jasper Blackburn Products Corp.,* 21 N. L. R. B. 1240.

These early intrusions of the Board into the substantive aspects of the bargaining process became a matter of concern to Congress, and in the 1947 Taft-Hartley amendments to the Wagner Act, Congress took steps to curtail them by writing into § 8 (d) the particular fields as to which it considered bargaining *should* be required. The bill originally passed by the House of Representatives contained a definition of the term "collective bargaining" which restricted the area of compulsory negotiation to specified .subjects, such as wages, hours, discharge or seniority provisions, safety conditions, and vacations. § 2 (11), H. R. 3020, 80th Cong., 1st Sess. The House Report on this bill, submitted by its sponsor, noted that the suggested provision would *require* unions and employers to bargain collectively as to specified topics and would limit that area ". . . to matters of interest to the employer and to the individual man at work." H. R. Rep. No. 245, 80th Cong., 1st Sess. 7. In explaining the need for specifying the topics over which bargaining was *mandatory,* and thereby establishing "objective standards" for the Board to follow, the Report continues:

> ". . . [T]he present Board has gone very far, in the guise of determining whether or not employers had bargained in good faith, in setting itself up as the judge of what concessions an employer must make and of the proposals and counterproposals that he may or may not make. . . . [Discussion of Board cases.]

> .        .        .        .        .

> "These cases show that unless Congress writes into the law guides for the Board to follow, the Board may attempt to carry this process still further and seek to control more and more the terms of collective-bargaining agreements." *Id.,* at 19–20.

The Senate amendment to the House bill recast these provisions to read in substantially the form of present § 8 (d). That is, the Senate provisions contained no elaboration of compulsory bargaining topics, but used the general phrase: "wages, hours, and other terms and conditions of employment." In commenting on these changes, the managers of the House Conference appended a statement to the House Conference Report which observed:

". . . [T]he Senate amendment, while it did not prescribe a purely objective test of what constituted collective bargaining, as did the House bill, had to a very substantial extent the same effect as the House bill in this regard, since it rejected, as a factor in determining good faith, the test of making a concession and thus prevented the Board from determining the merits of the positions of the parties." H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 34.

The foregoing history evinces a clear congressional purpose to assure the parties to a proposed collective bargaining agreement the greatest degree of freedom in their negotiations, and to require the Board to remain as aloof as possible from regulation of the bargaining process in its substantive aspects.

The decision of this Court in 1952 in *Labor Board* v. *American National Insurance Co., supra,* was fully in accord with this legislative background in holding that the Board lacked power to order an employer to cease bargaining over a particular clause because such bargaining under the Board's view, entirely apart from a showing of bad faith, constituted *per se* an unfair labor practice. There an employer insisted during negotiations upon the union's acceptance of a "management functions" clause which would vest exclusively in management during the period of the collective bargaining agreement the right to select, hire, and promote employees, to discharge for

cause and maintain discipline, and to determine work schedules. The arguments advanced by the Board in that case in support of its conclusion that the employer had committed an unfair labor practice through its insistence on this clause were strikingly similar to those before us here. It was said that such a clause was "in derogation of" statutory rights to bargain given to the employees, and that insistence upon it was tantamount to refusal to bargain as to all statutory subjects covered by it.

But this Court, in reversing the Board, emphasized that flexibility was an essential characteristic of the process of collective bargaining, and that whether the topics contained in the disputed clause should be allocated exclusively to management or decided jointly by management and union ". . . is an issue for determination across the bargaining table, not by the Board." 343 U. S., at 409. It is true that the disputed clause related to matters which concededly were "terms and conditions of employment," but the broad rationale of the Court's opinion undercuts an attempt to distinguish the case on any such ground. "Congress provided expressly that the Board should not pass upon the desirability of the substantive terms of labor agreements. . . . The duty to bargain collectively is to be enforced by application of the good faith bargaining standards of Section 8 (d) to the facts of each case . . . ." 343 U. S., at 408–409.

I therefore cannot escape the view that today's decision is deeply inconsistent with legislative intention and this Court's precedents. The Act sought to compel management and labor to meet and bargain in good faith as to certain topics. This is the *affirmative* requirement of § 8 (d) which the Board is specifically empowered to enforce, but I see no warrant for inferring from it any power in the Board to *prohibit* bargaining in good faith as to lawful matters not included in § 8 (d). The Court rea-

sons that such conduct on the part of the employer, when carried to the point of insistence, is in substance equivalent to a refusal to bargain as to the statutory subjects, but I cannot understand how this can be said over the Trial Examiner's unequivocal finding that the employer did in fact bargain in "good faith," not only over the disputed clauses but also over the statutory subjects.

It must not be forgotten that the Act requires bargaining, *not* agreement, for the obligation to bargain ". . . does not compel either party to agree to a proposal or require the making of a concession." § 8 (d). Here the employer concededly bargained but simply refused to *agree* until the union would accept what the Court holds would have been a lawful contract provision. It may be that an employer or union, by adamant insistence in good faith upon a provision which is not a statutory subject under § 8 (d), does in fact require the other party to bargain over it. But this effect is traceable to the economic power of the employer or union in the circumstances of a given situation and should not affect our construction of the Act. If one thing is clear, it is that the Board was not viewed by Congress as an agency which should exercise its powers to aid a party to collective bargaining which was in an economically disadvantageous position.

The most cursory view of decisions of the Board and the circuit courts under the National Labor Relations Act reveals the unsettled and evolving character of collective bargaining agreements. Provisions which two decades ago might have been thought to be the exclusive concern of labor or management are today commonplace in such agreements.[1] The bargaining process should be left fluid,

---

[1] A variety of topics have been held to be subjects over which an employer must bargain. *E. g., Inland Steel Co. v. Labor Board,* 170 F. 2d 247 (pension and retirement plans); *Union Mfg. Co.,* 76 N. L. R. B. 322 (bonuses).

free from intervention of the Board leading to premature crystallization of labor agreements into any one pattern of contract provisions, so that these agreements can be adapted through collective bargaining to the changing needs of our society and to the changing concepts of the responsibilities of labor and management. What the Court does today may impede this evolutionary process. Under the facts of this case, an employer is precluded from attempting to limit the likelihood of a strike. But by the same token it would seem to follow that unions which bargain in good faith would be precluded from insisting upon contract clauses which might not be deemed statutory subjects within § 8 (d).

As unqualifiedly stated in *Labor Board* v. *American National Insurance Co., supra,* p. 357, it is through the "good faith" requirement of § 8 (d) that the Board is to enforce the bargaining provisions of § 8. A determination that a party bargained as to statutory or nonstatutory subjects in good or bad faith must depend upon an evaluation of the total circumstances surrounding any given situation. I do not deny that there may be instances where unyielding insistence on a particular item may be a relevant consideration in the over-all picture in determining "good faith," for the demands of a party might in the context of a particular industry be so extreme as to constitute some evidence of an unwillingness to bargain. But no such situation is presented in this instance by the "ballot" clause. "No-strike" clauses, and other provisions analogous to the "ballot" clause limiting the right to strike, are hardly novel to labor agreements.[2] And in any event the

---

[2] It was stipulated by the parties during hearings on the charge of unfair labor practices that collective bargaining agreements between several unions and companies have incorporated clauses requiring, in one form or another, secret ballots of employees before the union is able to call a strike. The clauses varied in defining employees to

uncontested finding of "good faith" by the Trial Examiner forecloses that issue here.

Of course an employer or union cannot insist upon a clause which would be illegal under the Act's provisions, *Labor Board* v. *National Maritime Union,* 175 F. 2d 686, or conduct itself so as to contravene specific requirements of the Act. *Medo Photo Supply Corp.* v. *Labor Board,* 321 U. S. 678. But here the Court recognizes, as it must, that the clause is lawful under the Act,[3] and I think it

include only union members or all those working in the unit represented by the union and gave varying effect to the employee vote. The clause here involved does not purport to make the vote of the employees binding on the union.

[3] I find no merit in the union's position that the "ballot" clause is unlawful under the Act since in derogation of the representative status of the union. The statute and its legislative background undermine any such argument, for the Taft-Hartley Act incorporates in two sections provisions for a pre-strike ballot of employees and earlier drafts of the Act would have made an employee ballot *mandatory* as a condition precedent to all strikes.

The Hartley bill, as passed by the House, provided that employees should be informed in writing of issues in dispute and that a secret ballot of employees should be held on the employer's last offer of settlement and on the question of a strike. Only if the employees rejected the last offer and voted to strike could the union authorize a strike. § 2 (11), H. R. 3020, 80th Cong., 1st Sess. The Report on the bill states that ". . . at least the more irresponsible strikes . . . will be greatly reduced by requiring strike votes after each side has had an opportunity to state its position and to urge its fairness upon those called upon to do the striking." H. R. Rep. No. 245, 80th Cong., 1st Sess. 22.

These mandatory provisions were later discarded, and in their place Congress enacted § 203 (c) in Title II of the Taft-Hartley Act, 61 Stat. 154, 29 U. S. C. § 173 (c), under which the Director of the Federal Mediation and Conciliation Service is in certain situations to seek to induce the parties in dispute to agree voluntarily to an employee vote on the employer's last offer prior to a strike. In commenting on this change, the managers of the House Conference stated: "While the vote on the employer's last offer by secret ballot

clear that the company's insistence upon it violated no statutory duty to which it was subject. The fact that the employer here *did* bargain with the union over the inclusion of the "ballot" clause in the proposed agreement distinguishes this case from the situation involved in the *Medo Photo Supply Corp.* case, *supra,* where an employer, without the sanction of a labor agreement contemplating such action, negotiated *directly* with its employees in reference to wages. This Court upheld the finding of an unfair labor practice, observing that the Act ". . . makes it the duty of the employer to *bargain collectively with the chosen representatives* of his employees. The obligation being exclusive . . . , it exacts 'the negative duty to treat with no other.' " 321 U. S., at 683–684. (Italics added.) Bargaining directly with employees ". . . would be subversive of the mode of collective bargaining which the statute has ordained . . . ." 321 U. S., at 684. The important consideration is that the Act does not purport to define the terms of an agreement but simply secures the representative status of the union for purposes of bargaining. The controlling distinction from *Medo Photo* is that the employer here has not sought to bargain with anyone else over the terms of the agreement being negotiated.

---

is not compulsory as it was in the House bill, it is expected that this procedure will be extensively used and that it will have the effect of preventing many strikes which might otherwise take place." H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 63. The inescapable conclusion in view of this legislative history is that Congress, instead of making the pre-strike ballot *mandatory,* intended to leave such ballot clauses to the *decision of the parties* to a labor agreement to be arrived at through the normal collective bargaining process. Cf. § 201 (c) of Title II, 61 Stat. 152, 29 U. S. C. § 171 (c). There is a further provision for a pre-strike ballot in § 209 (b) of Title II, 61 Stat. 156, 29 U. S. C. § 179 (b), which relates to disputes which imperil national health or safety.

## II.

The company's insistence on the "recognition" clause, which had the effect of excluding the International Union as a party signatory to agreement and making Local 1239 the sole contracting party on the union side, presents a different problem. In my opinion the company's action in this regard did constitute an unfair labor practice since it contravened specific requirements of the Act.

Section 8 (a)(5) makes it an unfair labor practice for an employer not to bargain collectively "with the representatives of his employees." Such representatives are those who have been chosen by a majority of the employees of the appropriate unit, and they constitute ". . . the exclusive representatives of all the employees in such unit for the purposes of collective bargaining . . . ." § 9 (a). The Board under § 9 (c) is authorized to direct a representation election and certify its results. The employer's duty to bargain with the representatives includes not merely the obligation to confer in good faith, but also ". . . the execution of a written contract incorporating any agreement reached if requested . . ." by the employees' representatives. § 8 (d). I think it hardly debatable that this language must be read to require the company, if so requested, to sign any agreement reached with the same representative with which it is required to bargain. By conditioning agreement upon a change in signatory from the certified exclusive bargaining representative, the company here in effect violated this duty.

I would affirm the judgment of the Court of Appeals in both cases and require the Board to modify its cease and desist order so as to allow the company to bargain over the "ballot" clause.