**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**CHEESE BARN, INC. d/b/a Hickory Farms of Ohio, Respondent.**

No. 76–1797.

United States Court of Appeals, Ninth Circuit.

July 7, 1977.

Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Michael D. Stein, Atty., Washington, D. C., argued for petitioner.

Warren C. Ogden, Jr., argued, Davis, Wright, Todd, Riese & Jones, Seattle, Wash., for respondent.

Before BROWNING, TRASK and WALLACE, Circuit Judges.

WALLACE, Circuit Judge:

The National Labor Relations Board (Board) found Cheese Barn, Inc. (Cheese Barn) guilty of an unfair labor practice: insisting to impasse on a nonmandatory subject of bargaining, in this case, a clause requiring bargaining unit employee ratification of the proposed collective bargaining agreement as a condition precedent to its operation. As part of the remedy, the Board ordered Cheese Barn to execute the collective bargaining agreement already signed by the Retail Clerks Union Local No. 1105 (Union). 222 N.L.R.B. No. 62 (1976). The Board then applied to us for enforcement of its order. Finding the factual predicates to the Board's decision supported by substantial evidence and agreeing with the Board's legal conclusions, we grant enforcement.

## I.

All of Cheese Barn's legal arguments are premised on a single assertion of fact: Cheese Barn and the Union actually agreed during the course of negotiations that ratification by the bargaining unit employees of the proposed collective bargaining agreement would constitute a condition precedent to operation of the agreement. Cheese Barn does not argue that the Board made a contrary finding of fact which is not supported by substantial evidence. Rather, it argues that its characterization of the negotiations regarding member ratification is consistent with the facts as found by the administrative law judge and adopted by the Board. Our review of those findings in light of the underlying record, however, convinces us that Cheese Barn has misinterpreted or mischaracterized them. Further, we hold that the Board's findings, properly interpreted, are supported by substantial evidence in the record considered as a whole.

The Union organized the employees at one of Cheese Barn's retail stores in Seattle, Washington, but Cheese Barn refused to bargain with the Union. The Union took the dispute to the Board which issued a *Gissel* bargaining order against Cheese Barn in March 1974. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Under compulsion of that order, Cheese Barn began negotiating with the Union for a first collective bargaining agreement to cover the unit employees. In these negotiations, Cheese Barn was represented by Robert Nelsen and Donald Dittman; the Union, by its president, Mervyn Henderson, its secretary-treasurer, Allen Berglund, and two of its business representatives, Thomas Ducharme and Claude Liday.

Early in the negotiations, during March and April 1974, the parties discussed the duration of the first agreement. The Union initially suggested three years, but the parties soon agreed upon a contract of one year to enable Cheese Barn and the Union officials to "get acquainted" with each other. Accordingly, when Cheese Barn sent its first contract proposal to the Union on April 17, it contained the following term:

19.1 This Agreement shall be in full force and effect from and after _____ until _____, at which time it shall be automatically renewed for a period of one (1) year from such date . . . .

In subsequent negotiating sessions, the Union officials commented on their intention to submit the final agreement to the unit employees for their vote. This was a standard practice with the Union although it was not a practice required by the Union's constitution or by-laws or embodied in any previous collective bargaining agreement to which the Union was a party.[1]

Negotiations progressed well and the parties began to feel that they were getting close to a final agreement. Accordingly, when Cheese Barn sent its second contract proposal to the Union on May 15, paragraph 19.1 read exactly as before except for the entry of "July 1, 1974" and "June 30, 1975" into the blanks. These entries reflected the

---

1. Berglund testified, regarding the modified paragraph 19.1 in the subsequent October 2 proposed agreement, that, "This is not our standard proposal. It is not the way we write duration clauses. This was something concocted apparently by the Employer representative."

parties' belief that they would reach final agreement before the first date.

Cheese Barn's May 15 proposal also contained a number of substantive revisions reflecting the prior course of the negotiations. On June 4, the Union responded to the proposal with a letter in which it addressed in detail several unresolved substantive issues. Regarding paragraph 19.1, the Union's letter stated: "Date subject to time of ratification." As later explained by testimony before the administrative law judge, this language was intended to convey the Union's concern that a final agreement might not be ready before July 1 and its interest in not having the one-year duration period foreshortened by a late agreement.

The negotiators thereafter met four more times—on June 26, July 16, September 20 and October 2—without reaching a final agreement. At all of these meetings, Cheese Barn's May 15 proposal with its tentative July 1 commencement date was on the table. Although at the last three meetings the July 1 date was obsolete, the parties did not discuss paragraph 19.1 or a new commencement date.

At the October 2 meeting, Cheese Barn presented a new proposed contract. In it, paragraph 19.1 was completely changed from its prior version to read: "This agreement shall be in full force and effect commencing with the date of ratification by bargaining unit employees . . .." The Union did not notice this change nor did the parties discuss it. They were directing their attention to the three remaining substantive areas of dispute.[2] In the days immediately following the October 2 meeting, Cheese Barn acceded on two of those three issues and the Union acceded on the third.

When, pursuant to its standard practice, the Union took the agreement to its members, it recommended ratification. The members, however, were displeased with the substantive provisions regarding wages

and seniority and voted to reject the agreement. The Union thereupon sought to reopen negotiations on the objected-to substantive provisions, but Cheese Barn refused to make further concessions. The Union also failed in its further attempts to secure member ratification.

On February 14, 1975, the Union advised Cheese Barn that it was willing to sign the October 2 proposal. At a meeting on February 19, Henderson deleted from the duration clause the words "ratification by bargaining unit employees" and inserted the word "signature." The agreement thus read: "[T]his agreement shall be in . . . effect commencing with the date of signature . . . .." Henderson then signed the contract and passed it to Nelsen. Nelsen stated that he did not have authority to sign it, but that he would take the contract to Derby, Cheese Barn's president.

After Nelsen spoke with Derby regarding the contract, Derby, on February 27, wrote a letter to Nelsen but inadvertently sent it to the Union. The letter in part stated:

> I have considered the revision of Article 19 of the proposed agreement which the union has proposed. Please communicate to the union the fact that this change is unacceptable. I feel, as the union apparently did at the time it proposed the ratification procedure, that this procedure is a proper one. I wish at this time to make no concessions on this point.

On March 4, the Union informed Nelsen that it had received a copy of the letter, and on March 7, Nelsen sent another copy of it to the Union. This was the first time Cheese Barn formally advised the Union that it was insisting on member ratification as a condition to making an agreement. Cheese Barn thereafter refused to sign the contract unless the "ratification" clause was re-inserted.

■ This recital of the facts, which in large measure tracks the well-supported findings of the administrative law judge,

---

2. The administrative law judge made a specific finding to this effect. *See* text at note 3, *infra*. That finding has adequate support. Berglund testified that at the October 2 meeting "the ratification thing [paragraph 19.1] . . . was never discussed." Liday gave similar testimony.

demonstrates the soundness of his determinative factual conclusion: The Union did not intend and did not manifest agreement that ratification by the bargaining unit employees would constitute a condition precedent to the collective bargaining agreement. In attempting to characterize the findings as stating the opposite—that the parties did have such an agreement— Cheese Barn relies heavily upon one sentence in the administrative law judge's decision. After noting that on October 7 Cheese Barn accepted the Union's proposals regarding two of the three remaining issues in dispute and that the Union withdrew is proposal regarding the third, the administrative law judge stated: "The parties agreed they had a contract." Cheese Barn urges that we conclude from this one sentence that member ratification language of paragraph 19.1 had been a subject of negotiation between the parties and expressed the intent of both Cheese Barn and the Union and was thus an agreed part of the contract. This conclusion, however, is wholly inconsistent with the administrative law judge's decision read as a whole and even with the one emphasized sentence when it is read in context. The administrative law judge made an express finding that "the Union's June 4 letter was *not* a union proposal that ratification be made a condition precedent to effectuation of the final agreement" and that the "new language of the duration provision [in Cheese Barn's proposal of October 2] passed unnoticed and was not discussed by the parties, intent as they were on securing agreement on the three substantive issues still separating them . . .." Cheese Barn's interpretation of the findings of fact is simply not tenable.[3]

## II.

In February 1975, when the Union abandoned efforts to secure more favorable wage and seniority terms and offered to sign the October 2 proposal, subject only to deletion of the member ratification provision in paragraph 19.1, that provision became the only issue separating the parties. Cheese Barn's insistence on that provision precluded final agreement. The remaining issue, therefore, is whether Cheese Barn had a right to insist on ratification or whether it was forbidden from doing so because ratification by bargaining unit employees is a nonmandatory subject of bargaining.

In *NLRB v. Borg-Warner Corp.*, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958), the Supreme Court construed § 8(a)(5) and § 8(d) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(5), (d), as creating two mutually exclusive categories of bargaining subjects: mandatory subjects of bargaining and nonmandatory subjects. The company or the union may insist in good faith on a provision governing the former, even to the point of impasse. A party may also attempt to bargain for a provision governing a nonmandatory subject of bargaining and, if the provision is otherwise legal and the other party agrees to it, the provision becomes an enforceable part of the collective bargaining agreement. But if the other party refuses to agree to a nonmandatory provision, the proposing party may not insist on its inclusion to the point of impasse. Such insistence is deemed to be an unfair labor practice under § 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5).

---

3. *Cheese Barn's characterization of the intent of the parties would undoubtedly be more convincing if all we had before us was paragraph 19.1 of the October 2 proposed collective bargaining agreement. But the record contains much more. The administrative law judge heard the testimony of many of the negotiators and admitted numerous exhibits. All this evidence serves to paint a detailed picture of the entire course of the negotiations. Cheese Barn never argued to the administrative law judge, to the Board or to us that this extrinsic evidence should have been excluded on the basis*

*of some form of the plain meaning rule or the parole evidence rule. We therefore, without examining the possible applicability of those rules, treat the extrinsic evidence as properly a part of the record.*

*The Union's negotiators undoubtedly were slothful in not noticing the change in paragraph 19.1 contained in the October 2 proposal. But we believe it would be improper on the facts of this case to permit Cheese Barn to use that negligence to avoid its statutory duty to bargain.*

**530**

The Supreme Court applied these principles in *Borg-Warner* and found the company guilty of an unfair labor practice. During the course of collective bargaining, the company had proposed and insisted on a "ballot" clause. This clause provided that,

as to all nonarbitrable issues (which eventually included modification, amendment or termination of the contract), there would be a 30-day negotiation period after which, before the union could strike, there would have to be a secret ballot taken among all employees in the unit (union and non-union) on the company's last offer. In the event a majority of the employees rejected the company's last offer, the company would have an opportunity, within 72 hours, of making a new proposal and having a vote on it prior to any strike.

*Id.* at 346, 78 S.Ct. at 721. In the Court's view, the ballot clause concerned a nonmandatory subject of bargaining because it related

only to the procedure to be followed by the employees among themselves before their representative may call a strike or refuse a final offer. It settles no term or condition of employment—it merely calls for an advisory vote of the employees. . . . The "ballot" clause . . . deals only with relations between the employees and their unions. It substantially modifies the collective-bargaining system provided for in the statute by weakening the independence of the "representative" chosen by the employees. It enables the employer, in effect, to deal with its employees rather than with their statutory representative.

*Id.* at 350, 78 S.Ct. at 723.

Since the Supreme Court's decision in *Borg-Warner*, the Board and the circuit courts addressing the issue have been unanimous in their conclusion that ratification of

a collective bargaining agreement by bargaining unit employees is a nonmandatory subject of bargaining. *E. g., NLRB v. C & W Lektra Bat Co.,* 513 F.2d 200 (6th Cir. 1975), *enforcing* 209 N.L.R.B. 1038 (1974);[4] *American Seating Co. v. NLRB* 424 F.2d 106 (5th Cir. 1970); *Houchens Market of Elizabethtown, Inc. v. NLRB,* 375 F.2d 208 (6th Cir. 1967), *enforcing* 155 N.L.R.B. 729 (1965); *Southland Dodge, Inc.,* 205 N.L.R.B. 276 (1973); *see NLRB v. Darlington Veneer Co.,* 236 F.2d 85 (4th Cir. 1956). The analysis of the Sixth Circuit in *Houchens Market* is representative:

The Company, by insisting after all the other terms of the contract were agreed upon, that the contract be approved or ratified by a majority of the employees, was attempting to bargain, not with respect to "wages, hours and other terms and conditions of employment", but with respect to a matter which was exclusively within the internal domain of the Union. Members of a Union have the right to determine the extent of authority delegated to their bargaining unit. It is within their province to determine whether or not their bargaining unit may enter into a binding contract with or without membership ratification. It is not an issue which the Company can insist upon without mutual agreement by the Union, any more than the Union can insist that the contract be submitted to the Board of Directors or stockholders of the Company. The Union, by virtue of its certification as exclusive bargaining agent, was empowered by its members to make agreements on behalf of the employees it represented without securing the approval of those employees.

375 F.2d at 212.

We agree that ratification of a collective bargaining agreement by bargaining unit employees is a nonmandatory

---

4. In *C & W Lektra Bat Co.,* 209 N.L.R.B. 1038 (1974), *enforced* 513 F.2d 200 (6th Cir. 1975), the Board required "specific proof" of "an agreement to make ratification a condition precedent to a collective-bargaining agreement." *Id.* at 1039. This requirement apparently is intended to make the evidentiary bur-

den of a party in Cheese Barn's position more onerous. We have no need to pass on the Board's requirement in this case because the evidence, unadorned by any presumptions or rules affecting the burden of proof, establishes the absence of an agreement to make ratification a condition precedent.

subject of bargaining. Indeed, Cheese Barn makes no very serious argument to the contrary. Its primary contention, as noted above, is that the ratification provision, whether characterized as a mandatory or nonmandatory subject of bargaining, was actually agreed to by both parties and never was insisted on to impasse. But the facts are otherwise. The Union and Cheese Barn had a contract containing their agreements on all mandatory subjects of bargaining. The only obstacle to that contract's execution was Cheese Barn's unyielding insistence on a ratification plan to which the Union had not previously agreed. By thus insisting to impasse on this nonmandatory subject of bargaining, Cheese Barn committed an unfair labor practice.[5]

ENFORCEMENT GRANTED.

---

5. Cheese Barn argues that the Board's order directing it to sign the final agreement is invalid because the "board is simply without power to force the employer to adopt a unilateral change in the duration clause of the agreement." This argument has no merit on the facts of this case. Early in the bargaining, both Cheese Barn and the Union agreed that the duration of the collective bargaining agreement would be one year. The duration specified in the final agreement is one year. The Board is not, therefore, forcing Cheese Barn to accept a substantive contractual provision to which it had not previously agreed.