COLONIAL SCHOOL BOARD, Petitioner
Below, Appellant,

v.

COLONIAL AFFILIATE, NCCEA/DSEA/
NEA, Respondent Below, Appellee.

No. 105, 1982.

Supreme Court of Delaware.

Submitted: July 23, 1982.
Decided: Aug. 4, 1982.

Perry F. Goldlust (argued) and Richard David Levin, of Levin, Spiller and Goldlust, Wilmington, for petitioner below, appellant.

Sheldon N. Sandler (argued) of Young, Conaway, Stargatt & Taylor, Wilmington, for respondent below, appellee.

Before HERRMANN, C. J., McNEILLY and HORSEY, JJ.

HERRMANN, Chief Justice:

In this declaratory judgment action, the petitioner Colonial School Board (hereinafter "the Board") sought a determination that it would be unlawful for it to engage in collective bargaining negotiations with the respondent Colonial Affiliate, NCCEA, DSEA, NEA (hereinafter "the Union") regarding certain issues the Union desired to negotiate in collective bargaining. The Court of Chancery entered summary judgment for the Union. The Board appeals.

I.

The Board is the duly elected representative of the citizens residing within the Colonial School District. The Union is the official employee organization recognized by the Board as the exclusive bargaining representative for its certificated employees: teachers, nurses, psychologists, and guidance counselors. The Union and the Board have engaged in intensive collective bargaining for almost a year, addressed to a new contract. In so doing, the Union has persistently demanded negotiations upon the following contract proposals:

(1) The creation of the following committees—

(a) A Student Conduct and Discipline Committee, to develop methods and procedures in student disciplinary matters including the modification of the Board's Code of Student Conduct and Responsibilities, student attendance, discipline and discipline records;

(b) An Administrative Vacancy Committee, to review candidates and determine standards for the selection of people for administrative positions (those positions outside the bargaining unit);

(c) A Grade Reporting Committee, to review and develop standards and tools for student grade reporting and student promotion; and

(d) An Instructional Council, to advise the Superintendent and Board on curriculum, in-service programs, philosophy, educational goals and other topics deemed appropriate by the Union.

(2) All proposed committees or councils would be composed of an equal number of Union appointees and administrators. Since equality of representation portends deadlock, the Union proposed that disagreements were to be submitted to a panel of three persons (the third being selected by the joint recommendation of the Union's and the Board's representatives) for binding resolution.

(3) The grievance procedure would include submission of disputes over the propriety and interpretation of Board policy and administrative rules and regulations. Such procedure would terminate in advisory arbitration, binding if allowed by law.

(4) The Employee Rights proposal would prohibit the Board from laying off employees if a school were closed because of a labor dispute with another Union; would prohibit the Board from subcontracting work (even to volunteers) without the Union's approval; would limit the Board's au-

thority to determine standards for grading and promotion of students; would limit the Board's authority in student placement, class size, and the development of programs appropriate to specific student needs; and would limit the Board's control of parent/teacher relationships.

(5) The Maintenance of Classroom Control and Discipline proposal would force the Board to negotiate with the teachers concerning techniques used in serving the needs of "disruptive students," including the right of teachers to unilaterally exclude students indefinitely from a classroom.

(6) The Protection of Employee, Pupil and Property proposal would require negotiation over standards for the development of programs of alternative education for children who cannot be accommodated in the regular classrooms because of the student's behavior.

(7) The Employment Transfer and Administrative Vacancies, Reduction in Force (RIF), and Recall proposals would limit the Board's authority to exercise discretion in the deployment of its professional staff. Standards for employee selection, retention, transfer, lay off and recall would be covered by the proposed contract rather than be subjected to Board policy. A mechanical seniority system would be the only standard by which the Board could distinguish between two otherwise certificated employees.

(8) The Employee Work Year and Time Requirements proposals would establish, over the term of the collective bargaining agreement, the exact number of minutes a day of in-class teaching time that could be scheduled, the grouping of blocks of teaching and non-teaching time, the time when school would be allowed to start and when school must finish, the maximum number of periods to be taught a day, the number of buildings to be assigned to teachers who work in multiple locations, etc. These proposals would also result in secondary nego-

tiations over the size of the teaching and para-professional staff because the fewer the number of minutes a teacher can be required to be in a classroom, the more teachers and para-professionals will be needed to fill the school day.

(9) The Fair Dismissal proposal would limit how the Board determines the continued employment of non-tenured teachers.

(10) The Special Education proposal would result in negotiations over the development of programs for the educationally, socially, and emotionally disabled children as well as the educationally gifted students.

(11) The Maximum and Efficient Pupil/Employee Ratios proposal would result in negotiations over which class size is economical, educationally sound and cost justified for each category of student.

\* \* \*

The Board takes the position that to enter into collective bargaining negotiations and the resulting contract with the Union upon the foregoing contract proposals would result in violation of statutes (1) governing the Board's general authority and responsibility in policy matters entrusted to it by the General Assembly; and (2) prescribing the specific areas in which the Board is empowered to engage in collective bargaining negotiations. The Union contends generally that, absent statutory language expressly prohibiting the negotiation of the policy matters covered, its contract proposals are proper as permissive subjects of collective bargaining.

## II.

The Court of Chancery agreed generally with the Board's contentions, but concluded that *Newnam v. Board of Education of Mt. Pleasant School District*, Del.Supr., 350 A.2d 339 (1975) governed and that, therefore, it was compelled to rule in favor of the Union.[1] We agree with the Court of

---

1. The Court of Chancery expressed its key views as follows:

 "Quite frankly, I agree with much of what the School Board argues. The statutes govern-

ing the professional negotiations and relations of teachers, found at 14 *Del.C.*, Ch. 40, make only three areas the subject of mandatory collective bargaining, namely, salaries, employee

Chancery as to the validity of the Board's contentions; we disagree, however, that *Newnam* requires rejection thereof and a decision in favor of the Union.

### III.

The governing Statute supports the Board's position that it may not lawfully contract upon the Union's above-listed proposals and, therefore, may not lawfully engage in collective bargaining negotiations relative thereto.

■ The Statute that enables teachers to collectively bargain in Delaware is "The Professional Negotiations and Relations Law," 14 *Del.C.* ch. 40. It specifically identifies and defines the mandatory subjects of collective bargaining negotiations:

14 *Del.C.* § 4006(a):

"An organization certified as the exclusive negotiating representative shall have the right to be the exclusive negotiating representative of public school employees of the school district in all matters relating to salaries, employee benefits and working conditions."

\* \* \*

14 *Del.C.* § 4008(a):

"The board of education or its representative and the exclusive negotiating representative of the public school employees, through their designated officials or representatives, and upon the request of either party, shall have the duty to negotiate in good faith with respect to salaries, employee benefits and working conditions."

\* \* \*

14 *Del.C.* § 4001(1):

"Definition of terms.

"As used in this chapter:

"(1) 'Employee benefits' means those items contributing to the employee's welfare paid by the local school district and not subject to income taxation of the employee, i.e., medical and life insurance. 'Employee benefits' also include a 'dues check-off' system.

\* \* \*

"(3) 'Salaries' means the direct compensation of the employee for his (her) professional services.

\* \* \*

"(6) 'Working conditions' means physical condition of facilities in the school

benefits, and physical working conditions. 14 *Del.C.* § 4008(a). In this sense, the statute dealing with professional school employees is more restricted than the statute dealing with the collective bargaining rights of public employees generally, since with the latter the scope of bargaining specifically embraces 'other terms and conditions of employment.' 19 *Del.C.* § 1301(3). Legally, one is entitled to presume a legislative purpose for this distinction.

"The thought of an intentional limitation on the bargaining rights of teaching personnel is further justified by the language of 14 *Del.C.* § 4006(b) which reads as follows:

'Nothing in this chapter shall be construed as to prohibit the Board of Education and the exclusive negotiating representative from mutually agreeing on *other matters for discussion*, except as prohibited in subsection (c) of § 4011 of this title [the provision which prohibits strikes].' (Emphasis added)

Thus, while the statutes require a school board to confer and negotiate as to the three enumerated mandatory categories, the reference to 'other matters' in § 4006(b) is limited to 'discussion' between a school board and the 'negotiating' representative. The School Board sug-

gests that this was a deliberate rather than inadvertent choice of terms, and that it means only that the exclusive bargaining representative for teachers is thereby authorized to speak for them and to discuss with the School Board from time to time other matters of mutual interest in the area of employment relations, and that it does not constitute a legislative expression that all 'other matters' are permissible subjects for mutually agreeable collective bargaining and contractual commitments by a school board.

"This thought is buttressed by the fact that at common law public employees were not entitled to bargain collectively or to enter into collective bargaining agreements, *State v. Delaware State Educational Association*, Del.Ch., 326 A.2d 868 (1974), thus arguably meaning that unless a right to negotiate and bargain is clearly given by statute it must be presumed to remain prohibited.

"Despite these factors, however, I find that a contrary result is dictated by the decision in *Newnam v. Board of Ed. of Mt. Pleasant Sch. Dist.*, Del.Supr., 350 A.2d 339 (1975). I must respectfully confess that I have always been somewhat puzzled by the holding of the Supreme Court in *Newnam.*"

district buildings such as, but not limited to heat, lighting, sanitation and food processing."

There is no express provision for "permissive" subjects of collective bargaining.

■ Especially significant in the statutory provisions here involved is the use of § 4008(a) of the words "negotiate in good faith" in the context of "salaries, employee benefits and working conditions," as contrasted with the use in § 4006(b) of the word "discussion" in the context of "other matters." There is ambiguity here and, therefore, room for statutory construction and judicial scrutiny for legislative intent.

It is reasonable to assume that, by its deliberate choice of words, the General Assembly intended a careful distinction between "salaries, employee benefits, and working conditions," on the one hand, and "other matters" on the other. The words "negotiate" and "discuss" are ordinary words in common usage and are to be accorded their ordinary meanings as used in the Statutes here involved. No dictionary references are needed to know that to "negotiate" means to bargain toward a desired contractual end, whereas to "discuss" means merely to exchange thoughts and points of views on matters of mutual interest, with no bargaining overtones necessarily involved. In this connection, this Court stated in *Newnam*:

> "We note that § 4006(b) authorizes the Board 'to discuss' what are described as 'other matters' but the statute is silent as to its power to contract about them." (350 A.2d at 341)

Clearly, the General Assembly intended that the School Board maintain an "open door" policy as to "discussions" with the Union; equally clear, we think, is the legislative intent to close the door on collective bargaining and restrict the authority to negotiate a contract as to any subject other than those specified in § 4008(a): "salaries, employee benefits, and working conditions." If the General Assembly had intended to authorize the Board to include any relevant matter in a collective bargaining negotiation and contract with teachers and school

administrators, it would have known how to define more broadly the subjects authorized for collective bargaining negotiations and contracts. Alternatively, it could have clearly empowered the Board to permit precontract collective bargaining "discussions" in the nature of negotiations. The General Assembly did neither.

■ In addition, the General Assembly is presumed to have been aware of two facets of existing law when it enacted The Professional Negotiations and Relations Law in 1969:

First, at common law, public employees had no right to collectively bargain. *State v. Delaware State Education Association,* Del.Ch., 326 A.2d 868, 874 (1974). Thus, the General Assembly is presumed to have known that only the subjects expressly authorized by the Statute being enacted were being sanctioned as lawful for collective bargaining and contract; and that matters not included in the express statutory enumeration were thereby excluded. It is axiomatic that statutes in derogation of the common law are to be strictly construed.

Second, the General Assembly is also presumed to have known, when it enacted the Statute here involved, that there had been enacted in 1965 the Delaware Right of Public Employees to Organize Act (19 *Del.C.* ch. 13) covering public employees other than teachers and school administrators. Included in that Act was the requirement of collective bargaining regarding "wages, salaries, hours, vacations, sick leave, grievance procedure, and *other terms and conditions of employment.*" (emphasis supplied). In the ascertainment of legislative intent and the construction of 14 *Del.C.* ch. 40, it is quite significant that in the 1969 Act covering teachers and school administrators, the General Assembly deliberately deprived them of the broad enumeration of subjects authorized in 1965 for collective bargaining by other public employees and allowed only "discussion" of all subjects other than "salaries, employee benefits and working conditions."

Giving due consideration to the common law barring all collective bargaining by public employees prior to the Statutes, the strict construction to be given Statutes in derogation of the common law, and the seemingly careful and deliberate legislative restriction upon the negotiable subjects authorized for collective bargaining and contracts with teachers and school administrators, we conclude that there is no room in 14 *Del.C.* ch. 40 for "permissive negotiations" or any other lawful collective bargaining negotiations except those expressly specified in § 4006(a) and § 4008(a), i.e., "matters relating to salaries, employee benefits and working conditions." We so hold. To go further, as the Union urges us to do, would be to engage in impermissible judicial legislation. If this strict construction of 14 *Del.C.* ch. 40 is deemed incorrect or unjust today, it is a matter for the General Assembly to rectify by clear and unambiguous statutory language requiring no interpretation and construction.

### IV.

To this point, we have been in agreement with the basic views of the Court of Chancery. As indicated, however, we have a divergence of opinion as to the controlling effect of *Newnam.*

The *Newnam* case is inapposite on its facts; more importantly, this Court did not decide in *Newnam* the issue presented here of § 4006(b) compared to § 4006(a) and § 4008(a). There, this Court noted the problem of statutory construction presented by the "discussion" language of § 4006(b) in the context of § 4006(a) and § 4008(a). But, in a short opinion which remanded the case on a mootness issue, this Court deliberately and clearly declined to consider the

scope and effect of § 4006(b) in *Newnam*, and expressly deferred "analysis" of § 4006(b) for future consideration if the case did not finally go off on the mootness issue in the Trial Court.[2] Thus, the § 4006(b) issue has not been heretofore decided by this Court in *Newnam* or elsewhere. This is a case of first impression in this Court upon that issue.

### V.

To assure the parties in interest that the foregoing conclusions have been reached after due consideration of the Union's arguments and the authorities it cites in support, we make brief reference thereto:

The Union's position, upon the facets of the case which we have deemed dispositive, starts from the basic premise that 14 *Del.C.* ch. 40 *expressly* authorizes collective bargaining upon the Union's contract proposals. In support of this premise, the Union contends:

■ (1) That the history of bargaining in Delaware under 14 *Del.C.* ch. 40 requires that conclusion because other school boards in Delaware and elsewhere have in the past negotiated and contracted upon subjects which the Board in the instant case now argues would be unlawful. We find the Union's position on this point untenable. This Court's interpretation of an ambiguous Statute and our determination of legislative intent may not be founded upon past practice consisting of extra-judicial decisions and courses of action unwarranted by any decision of this Court. Failure to enforce the law does not change the law.

■ (2) That the General Assembly used a different term ("discussion") for permissi-

2. "It seems to us that analysis of this Section [§ 4006(b)] is critical in determining what the Board may do in going beyond its legal duty to bargain about salaries, employee benefits and working conditions, all of which are covered specifically in §§ 4006, 4008 and 4010, respectively. We note that § 4006(b) authorizes the Board 'to discuss' what are described as 'other matters' but the statute is silent as to its power to contract about them. If the Trial Court reaches this issue, it will be, of course, resolved

on the basis of the facts found in this case." (350 A.2d at 341)

Noteworthy in this connection is *Morris v. Board of Education of the Laurel School District*, D.Del., 401 F.Supp. 188 (1975) which was noted by this Court in *Newnam.* Insofar as the *Morris* case may be deemed to recognize an authority or power in the Board to negotiate and contract as to "other matters" under § 4006(b), we must hereby respectfully disagree.

ble bargaining than for mandatory bargaining ("negotiation") to "avoid confusion and to distinguish those subjects that go to the [impasse] mediation and fact-finding process [under 14 *Del.C.* § 4010] from those that do not." Because this position suggests that the General Assembly must be deemed to have implied far more than it expressed about the intent and meaning behind the word "discuss" in § 4006(b), we reject the Union's contention. Again, we note that the General Assembly was able to provide, in clear and unambiguous statutory language for collective bargaining by public employees other than teachers and school administrators, the concepts which the Union now urges us to find by implication only. This argument would have us stretch too far the cardinal rule that statutes in derogation of the common law must be strictly construed.

 (3) That under the Board's approach, the scope of bargaining in Delaware would be uniquely narrow because it is "out of harmony with the desires of the General Assembly and the uniformly accepted approach to public sector collective bargaining around the country." This position is unsound if only because the General Assembly has demonstrated its ability to distinguish in its Statutes "other matters" for collective bargaining negotiation by public employees other than teachers and school administrators (see 19 *Del.C.* ch. 13). In addition, unless there is some connective legislative history—which is not the case here—the construction of an ambiguous Delaware Statute may not be founded upon different statutory structure and definitions in other States.

(4) That cases from other jurisdictions are in accord with the position of the Union. We find none of the cases cited by the Union persuasive because of fundamental differences between the Delaware Statute, here construed, and the statutory structures and definitions of the other jurisdictions, including those contained in the National Labor Relations Act, relied upon by the Union.[3]

## VI.

Both parties argue at length the Board's contention that its statutory grants of general authority over policy matters [14 *Del.C.* §§ 1043, 1049, and § 4008(c)] would be violated by collective bargaining of the Union's contract proposals at issue here.

In view of our determinative conclusions upon the issue of the statutory construction of § 4006(b), we do not reach the Board's general authority issue.

\* \* \*

Accordingly, as has been previously announced, we hold that, under 14 *Del.C.* ch. 40,[4] the power of the Board to engage in collective bargaining negotiations is limited to the subjects of "salaries, employee benefits and working conditions," as specified in § 4008(a) and as these terms are defined in § 4001(3, 1, 6).

Reversed and remanded for further proceedings consistent herewith.

**3.** The Union cites unpersuasive cases based upon inapposite or dissimilar statutes of Connecticut, Indiana, Illinois, Tennessee, Minnesota, Ohio, Nevada, and Pennsylvania. Similarly distinguishable are *Laborers International Union Local 1029 v. State of Delaware*, Del.Ch., 310 A.2d 664 (1973), aff'd., Del.Supr., 314 A.2d 919 (1974); *NLRB v. Wooster Division of Borg-Warner Corporation*, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958); and *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), all based upon dissimilar statutory structures and definitions.

**4.** House Bill No. 557, signed by the Governor July 7, 1982, provides:

"Section 4. This Act shall not apply to any contract negotiations between a public school employer and its employees initiated, pending, or in litigation prior to the enactment of this Act into law and said negotiations shall be controlled by 57 Delaware Laws Chapter 298 [14 *Del.C.* ch. 40]."