944 A.2d 611

IN THE MATTER OF THE ALLEGED IMPROPER PRACTICE UNDER SECTION XI, PARAGRAPH A(D) OF THE PORT AUTHORITY LABOR RELATIONS INSTRUCTION; IP 97–28, FINAL DECISION AND ORDER OF THE PORT AUTHORITY EMPLOYMENT RELATIONS PANEL: PORT AUTHORITY OF NEW YORK AND NEW JERSEY, PETITIONER–APPELLANT, v. PORT AUTHORITY EMPLOYMENT RELATIONS PANEL, RESPONDENT–RESPONDENT, AND PORT AUTHORITY POLICE BENEVOLENT ASSOCIATION, INC., INTERVENOR–RESPONDENT.

Argued February 4, 2008—Decided April 9, 2008.

316

*Donald F. Burke,* argued the cause for appellant.

*Christine Carey Lilore,* argued the cause for respondent Port Authority Police Benevolent Association.

*Robert E. Anderson,* argued the cause for respondent Port Authority Employment Relations Panel (*Mr. Anderson,* General Counsel, New Jersey Public Employment Relations Commission, attorney).

Justice RIVERA–SOTO delivered the opinion of the Court.

For over a decade, the Port Authority of New York and New Jersey (Port Authority) and the union representing its police officers, the Port Authority Police Benevolent Association, Inc.

(PBA), have litigated a discrete issue: whether the May 1997 lease of the international terminal at John F. Kennedy International Airport (JFK Airport)—and the resulting redeployment, without any job losses or terminations, of Port Authority police officers to other portions of the JFK Airport—gave rise to an obligation on the part of the Port Authority to collectively bargain that redeployment with the PBA.

Based on an improper practice charge filed by the PBA, a hearing officer assigned by the Port Authority Employment Relations Panel (Panel) concluded that "the Port Authority's unilateral decision to sublease operational control and management of the [international terminal] to [a private entity] was not a mandatory subject of negotiations." The hearing officer further concluded that, even if redeployment of the PBA-represented police officers constituted a transfer of work covered by the collective bargaining agreement, the PBA nevertheless had failed to satisfy the legal requirements necessary to find that such redeployment was a mandatory subject of negotiations. As a result, the hearing officer recommended that the PBA's improper practice charge be "dismissed in its entirety." The Panel rejected the hearing officer's recommendations, and concluded instead that "the Port Authority violated the [Port Authority of New York and New Jersey Labor Relations] Instruction [that provided for collective bargaining rights to employees of the Port Authority and created the Panel] when it transferred PBA unit work to non-unit employees without negotiating with the PBA." Citing to the deference owed to administrative agencies, both the Law Division and the Appellate Division sustained the Panel's determination.

We conclude that, pursuant to the Instruction governing labor relations at the Port Authority, the redeployment of Port Authority police officers occasioned by the 1997 lease of the international terminal at JFK Airport was exempt from any collective bargaining requirement. We further conclude that, even if the Port Authority was required to collectively bargain the effects of the 1997 lease of the international terminal at JFK Airport, and even

if the work on the leased premises may well have constituted "unit work," the Port Authority was not obligated to collectively bargain its transfer in any event.

## I.

### A.

Recognizing the special legal status of the Port Authority, we start with an overview of the parties and their interlocking relationships:

> On April 30, 1921, The Port of New York Authority was established to administer the common harbor interests of New York and New Jersey. The first of its kind in the Western Hemisphere, the organization was created under a clause of the [United States] Constitution permitting Compacts between states, with Congressional consent. An area of jurisdiction called the "Port District," a bistate region of about 1,500 square miles centered on the Statue of Liberty, was established. In 1972, the organization's name was changed to The Port Authority of New York and New Jersey to more accurately identify [its] role as a bistate agency.

> [http://www.panynj.gov/AboutthePortAuthority/HistoryofthePortAuthority/.]

> . . . .

> The Port Authority is a financially self-supporting public agency that receives no tax revenues from any state or local jurisdiction and has no power to tax. It relies almost entirely on revenues generated by facility users, tolls, fees, and rents. The Governor of each state appoints six members to the Board of Commissioners, subject to state senate approval. Board Members serve as public officials without pay for overlapping six-year terms. The Governors retain the right to veto the actions of Commissioners from his or her own state. Board meetings are public.

> The Board of Commissioners appoints an Executive Director to carry out the agency's policies and manage the day-to-day operations.

> [http://www.panynj.gov/AboutthePortAuthority/Governance/.]

See generally, N.J.S.A. 32:1-1 to 2-37; N.Y. Unconsol. Laws Ch. 151 § 1 (2007).

In 1976, the Port Authority adopted its Labor Relations Instruction. Among other things, the Instruction (1) safeguarded the right to collectively bargain via employee organizations for Port Authority non-managerial employees; (2) created the Panel to administer disputes between the Port Authority and its employee organizations; (3) established procedures for the processing of

those disputes; and (4) provided for judicial review of any decisions of the Panel. The grant of authority to the Panel was subject to a significant exemption: Section III(D) of the Instruction specifically provides that "[n]otwithstanding the foregoing, the mission and management responsibilities of the [Port] Authority, including its organization, staffing, planning, operating and financial policies, shall *not* be subjects of negotiation with employee organizations." (Emphasis supplied.) [1]

Finally, as provided in its collective bargaining agreement with the Port Authority, the PBA is "the sole and exclusive representative of [Port Authority] Police Officers for the purpose of collective negotiations with respect to rates of pay, hours of work and other terms and conditions of employment."

Having defined the triangle of parties in this dispute—the Port Authority, the Panel and the PBA—we turn to the facts underlying this controversy.

### B.

In April 1947, the Port Authority entered into an agreement with the City of New York. That agreement provided that the Port Authority would lease and operate the municipal airports then owned by New York City; among them was Idlewild Airport, now known as JFK Airport. Section 11(c) of the agreement stipulates that "[t]he Port Authority will provide police for patrolling, for guarding and for traffic control in the demised premises [and that t]he City will have no responsibility for maintaining . . . police personnel in the demised premises." Section 37 of the agreement further provides that

the Port Authority shall have full power and discretion to proceed with the financing, rehabilitation, expansion, improvement, development, operation and

---

[1] This Instruction was adopted by the Board of Commissioners of the Port Authority in 1976 at a public meeting of the Board; the minutes of that meeting were transmitted to the Governors of both New Jersey and New York and were approved, which made the Instruction effective and in force. *See N.J.S.A.* 32:2–6; *N.Y. Unconsol. Laws* Ch. 151–A § 2 (2007).

maintenance of the municipal air terminals, and to enter into such contracts, agreements, subleases or other arrangements with respect thereto as it may deem necessary and desirable, and all matters connected therewith, including but not limited to, all details of financing, construction, leasing, charges, rates, tolls, contracts, and operation shall be within the sole discretion of the Port Authority; and the decisions of the Port Authority in connection with any and all matters concerning the municipal air terminals shall be controlling, provided that all such things shall be done by the Port Authority in its own name and on its own credit.

## C.

In July 1991, the Port Authority entered into a Memorandum of Agreement with the PBA. That Memorandum recognized the PBA as the sole and exclusive representative of the Port Authority police officers for collective bargaining purposes. Section XXI(1) of the Memorandum of Agreement explains that, "[d]uring the term of this Memorandum of Agreement, no Police Officer ... shall be deprived of his employment as a Port Authority Police Officer ... by reason of the abolition or modification of the requirements for additional police coverage at [JFK] Airport, ... pursuant to ... Federal Aviation Regulations." It also states, in Sections XXX(1) and (7), as follows:

Subject to other provisions herein, and except as otherwise set forth in this Agreement, during the term of this Agreement, there will be no further or additional transfer and/or reassignment of unit work currently and heretofore performed by unit employees without negotiation and all other unit work currently and heretofore performed by Police Officers shall be maintained.

. . . .

All existing Police Officer positions and/or assignments shall be maintained during the term of this Memorandum of Agreement in accordance with the Police Position and/or Assignment List agreed upon between the parties so long as the work being performed continues to be performed by or on behalf of the Port Authority.

Section II(1) of the Memorandum of Agreement states that "any such practice, procedure or policy [governing existing terms and conditions of employment of Police Officers] pursuant to any ... instruction ... shall not be limited, restricted, impaired, removed or abolished unilaterally." Consistent with that limitation, Section II(2) of the Memorandum of Agreement makes clear that

[a] charge or complaint that the [Port] Authority has unilaterally limited, restricted, impaired, removed or abolished such a practice, procedure or policy governing an existing term and condition of employment which is not specifically enumerated or set forth in this Memorandum of Agreement shall not be subject to or processed through the grievance-arbitration procedure referred to in Section XXIII of this Memorandum of Agreement.[2]

## D.

Starting in 1994, the Port Authority embarked on a process to determine whether to modernize or replace the international terminal at JFK Airport; among the proposals to be considered was the solicitation of private investors. The following year, the Port Authority did solicit in the private sector and received four proposals. In 1997, it accepted a proposal from JFK International Air Terminal LLC (JFKIAT)[3] that provided for the construction of a new international terminal at an overall cost of $1.2 billion.

The Port Authority and JFKIAT entered into an exhaustive lease that outlined each party's obligations in respect of the international terminal at JFK Airport. Stating that "the Port Authority is obligated to have in effect and does now have in effect an airport security plan in accordance with [federal regulations]," the lease recites that "[t]he Security Plan outlines law enforcement requirements of the airport operator and physical barriers and access procedures to monitor and restrict access[.]" Acknowledging that "the implementation, maintenance and operation of the Premises pursuant to the requirements of the Security Plan is essential to the operation of the Premises and of the Airport[,]"

---

[2] Section XXIII of the Memorandum of Agreement specifically provides that "alleged violation[s]" of Section II(1) of the Memorandum of Agreement are exempt from the grievance or arbitration procedures of the Memorandum of Agreement and, hence, lie outside the Panel's limited jurisdiction.

[3] JFKIAT is a limited liability company comprised of three separate business interests: the developer responsible for the construction of the new terminal, the operator responsible for the operation of the completed terminal, and the financing source responsible for the financing of the new terminal, including the issuance of Port Authority municipal bonds.

JFKIAT agreed to "assume and fulfill all of the Port Authority's obligations and responsibilities under the Security Plan and [to] take all measures required, necessary or appropriate to implement and carry out the requirements of the Security Plan."

## E.

Approximately one month before entering into the lease with JFKIAT, the Port Authority met with the PBA, explained the lease proposal for the international terminal at JFK Airport, and assured the PBA that "no Port Authority Police Officers would be displaced from JFK Airport nor suffer any negative impact as a result of" the lease. Those assurances were followed by a Port Authority memorandum dated May 12, 1997 that advised that, effective at noon the following day, JFKIAT would "assume responsibility for the [international terminal, that] police services commensurate with that provided other unit terminals at JFK will be maintained[, and that f]rontage management of pedestrians and vehicles will become the responsibility of [JFKIAT]."

The lease became effective on May 13, 1997 and, from that date forward, JFKIAT assumed all security functions at JFK Airport's international terminal. Although those events required the redeployment of the Port Authority police officers formerly assigned to the international terminal, no police officer lost his or her job; the sole record evidence of any possible impact on the police officers was the unsubstantiated opinion of the chief of the Port Authority police department that, "by redeploying [Port] Authority Police Officers, he was 'certain' that their overtime was reduced."

Six weeks later, the PBA protested. In a letter dated June 24, 1997 and addressed to the Port Authority's director of human resources, the PBA set forth its view that "the Port Authority Labor Relations Instruction and the Memorandum of Agreement between the Port Authority and [the PBA] forbid this unilateral action by the Port Authority." It also asserted that, "without prejudice to [its] right to file an improper practice or grievance[, the] PBA requests immediate negotiations regarding the impact of

this decision upon our members[,]" explaining that "[t]he PBA will take appropriate action thereafter." On July 2, 1997, the Port Authority responded, rejecting any claim that the Port Authority had acted improperly, but expressing a willingness to discuss the PBA's concerns "as part of overall negotiations." The PBA did not respond to that invitation. Instead, on July 28, 1997, the PBA filed its improper practice charge against the Port Authority.

The PBA's improper practice charge specifically alleged that the Port Authority has either hired, subcontracted, permitted or suffered non-unit personnel to perform PBA unit work. Civilian personnel are directing and controlling traffic and are performing security functions at sites at or near the [international terminal,] which functions have traditionally and historically been performed by the PBA. This action was taken by the employer without any prior negotiation with the PBA in violation of the Labor Relations Instruction and the Memorandum of Agreement.

The Port Authority submitted a blanket denial of those charges, and the Panel assigned the matter to a hearing officer.[4]

After reviewing the factual background and the contentions of the parties, the hearing officer addressed the issues before him. First, he reasoned that the Security Plan work transferred via the lease from the Port Authority to JFKIAT consisted of "functions previously performed by Port Authority Police Officers both inside . . . and in the frontage area [of the international terminal]." He thus concluded that "the disputed work in issue is unit work, as alleged." However, the hearing officer found that "the record supports the [Port Authority's] contention that with the takeover by JFKIAT of [the international terminal], the [Port] Authority went out of the business of managing and operating that facility[.]" He therefore also found that "the [Port] Authority did not transfer

---

[4] The first hearing officer to whom this matter was assigned conducted two hearing dates, but then resigned his appointment upon being advised that he was being proposed for appointment to a federal post; shortly thereafter, he was appointed to serve as chairman of the National Labor Relations Board. The matter was reassigned to Hearing Officer Irwin Kaplin, who reviewed the evidence and transcripts of the first two hearing dates, conducted further hearings, considered the parties' post-hearings submissions, and filed a report and recommendation in the matter.

the disputed work." Based on those findings, he concluded that there was no basis for the PBA's improper practice charge.

The hearing officer's analysis did not end there. After assuming the PBA had made out a case that the work was "unit work" and that the Port Authority had transferred it to JFKIAT, he reasoned that the PBA had failed to establish that "the [Port] Authority's decision to do so was a mandatory subject of negotiations[.]" Applying the *"Fibreboard*[5] plus substantial impact" test, he determined that the PBA had failed to satisfy three of the four prongs of that test and, thus, concluded that "the unilateral decision that led to the loss of unit work at [the international terminal] by [Port] Authority Police Officers was not a mandatory subject of negotiations." He recommended that the PBA's improper practice charge be dismissed in its entirety.[6]

The PBA filed exceptions with the Panel. Although the Panel accepted the hearing officer's factual findings, it rejected the majority of the hearing officer's conclusions, concluding instead that "the Port Authority violated the Instruction when it transferred PBA unit work to non-unit employees without negotiating with the PBA." It noted that "[t]he initial inquiry in a matter involving the alleged unlawful transfer of unit work is whether the work is, in fact, unit work, i.e., work which historically has been performed by the unit." It cautioned that "[t]he work need not have been exclusively performed by the unit to constitute unit work." It observed that "only the preservation of unit work is negotiable" and that "there is no obligation to negotiate over the decision to eliminate, as opposed to transfer, unit work."

---

[5] *See Fibreboard Paper Prods. Corp. v. Nat'l Labor Relations Bd.,* 379 *U.S.* 203, 85 *S.Ct.* 398, 13 *L.Ed.*2d 233 (1964); *City of Jersey City v. Jersey City Police Officers Benevolent Ass'n,* 154 *N.J.* 555, 575–76, 713 *A.*2d 472 (1998).

[6] After the hearing officer rendered his report and recommendation, the PBA moved to reopen the hearing. That motion was denied, and that denial was not appealed.

Consistent with the hearing officer's conclusions, the Panel determined that "the work in dispute is unit work." It then addressed "the next threshold inquiry: was the work transferred." It "conclude[d] that it was." Based exclusively on its interpretation of the lease between the Port Authority and JFKIAT, the Panel reasoned that "[t]he work has not been eliminated but rather subcontracted by the Port Authority. Therefore, pursuant to Panel precedent, there has been a transfer of unit work." Because it had "determined . . . that the work in question is unit work and that there has been a transfer," the Panel applied the "*Fibreboard* plus substantial impact" test, explaining that

[t]he Port Authority was obligated to negotiate about the decision to transfer the work at issue if:

The Port Authority has not altered its basic operation;

The Port Authority has not made a capital investment which, if subject to collective negotiations, would significantly abridge the [Port] Authority's freedom to manage its business;

The issues which motivated the decision were peculiarly suitable for resolution within the collective negotiations framework; and

The decision substantially impacts upon the wages, hours, [and] terms and conditions of employment, either quantitatively or qualitatively.

It concluded that (1) "[t]he Port Authority has not altered its basic operation as a result of its lease arrangement with JFKIAT[;]" (2) "the issue here did not involve a capital investment which would, if collectively negotiated, significantly abridge the Port Authority's freedom to manage its business[;]" (3) "the issues which motivated the decision were peculiarly suitable for resolution within the collective bargaining process[;]" and (4) "the decision to have the work performed by non-unit [personnel] rather than by Port Authority police officers represented by the PBA had a substantial impact upon the wages, hours and working conditions of the PBA bargaining unit." It thus determined to sustain the PBA's improper practice charge because "the Port Authority violated Instruction Section XI(A)(d) and the Memorandum of Agreement when, without prior negotiations, it transferred the work to JFKIAT." As a remedy, the Panel ordered that the Port Authority "cease and desist from unilaterally transferring PBA

unit work to non-unit personnel[;]" that the Port Authority "restore the status quo ante by restoring the unit work at issue to the PBA bargaining unit;" that the Port Authority "negotiate upon request with the PBA before unilaterally changing terms and conditions of employment;" and that the Port Authority post, "at appropriate places of business[,]" a specified notice to all employees consistent with the substantive relief it afforded the PBA.

Seeking a review of the Panel's determination,[7] the Port Authority filed an action in lieu of prerogative writs pursuant to *R.* 4:69–1 to –7.[8] The trial court determined that "the Panel is an administrative agency created to review employment issues under the Instruction." From that premise, the trial court afforded the Panel the deference New Jersey allows to the determinations of administrative agencies, *see In re Taylor,* 158 *N.J.* 644, 656, 731 *A.*2d 35 (1999); *Pub. Serv. Elec. & Gas Co. v. N.J. Dep't of Envtl. Prot.,* 101 *N.J.* 95, 103, 501 *A.*2d 125 (1985), and concluded that "a decision of the Panel will be upheld if it is supported by substantial evidence in the record, and is neither arbitrary, capricious, nor unreasonable." It concluded that "the Final Order and Decision of the Panel is supported by substantial credible evidence in the record and is neither arbitrary, capricious, or unreasonable substantially for the reasons given by the Panel in its Final Decision and Order[.]" It affirmed the Panel's determination.

The Port Authority pressed its appeal to the Appellate Division, presenting a two-pronged attack. First, the Port Authority argued that, under the Instruction, it is afforded unfettered discretion in respect of its "mission and management responsibilities" and that these specifically include "its organization, staffing, plan-

[7] The Port Authority named only the Panel as a party defendant. The PBA sought, and was granted, intervenor status.

[8] Both *N.J.S.A.* 32:1–175 and *N.Y. Unconsol. Laws* Ch. 599 § 1 (1977) list several avenues of review from orders from the Panel, including that such orders "shall be ... reviewable ... by action in lieu of prerogative writ[s] in the State of New Jersey[.]"

ning, operating and financial policies[.]" Second, it argued that the Panel's analysis of the lease between the Port Authority and JFKIAT was incorrect as a matter of law, and that the Panel's conclusion that the Port Authority retained a vestigial obligation to provide security to the international terminal was in error. The Appellate Division, in an unpublished opinion that also relied heavily on a deferential standard of review, declared itself "satisfied that the Panel's findings and conclusions of law reached therefrom are unassailable." It thus affirmed the judgment of the trial court.

We granted the Port Authority's petition for certification, 191 *N.J.* 317, 923 *A.*2d 232 (2007), and, for the reasons that follow, we reverse the judgment of the Appellate Division, and remand the cause for the entry of an order vacating the Panel's order and dismissing the improper practice charge filed by the PBA against the Port Authority.

## II.

The Port Authority initially advanced four grounds for certification. First, it argued that, because the Port Authority was created by the exercise of the sovereign powers of two states which retained a significant portion of their immunity in the Instruction, the Appellate Division did not defer to "established and well recognized governmental prerogatives regarding the manner in which to provide essential governmental services by disregarding express limitations imposed on the Panel in deciding labor disputes." Closely aligned to that argument is the Port Authority's contention that the Appellate Division did not show proper deference to principles of New Jersey and New York law concerning governmental prerogatives in transferring or subcontracting work. Third, the Port Authority urged that the Appellate Division erred in giving deference to the Panel's conclusions of law in respect to the provisions of the lease between the Port Authority and JFKIAT. Fourth, the Port Authority claimed that the Appellate Division failed to properly credit the hearing officer's

conclusions, that is, that the Panel, and by extension the Appellate Division, did not determine that the hearing officer's conclusions were not supported by substantial credible evidence or were otherwise arbitrary, capricious or unreasonable.

In its reply brief, the Port Authority pressed its overarching claim: that this case requires that the Court address "the fundamental power and authority of government to make important decisions regarding the manner in which governmental services are provided without being shackled by having to engage in labor negotiations *before* such decisions are made."

According to the Panel, the sole issue in this case is whether the Panel abused its discretion. It claimed that "[t]he Panel's standards under the Instruction for analyzing transfer of unit work allegations have been in place and accepted by the parties for over 25 years" and, thus, no abuse of discretion is present.

The PBA asserted that "[t]he issue is not the manner in which essential governmental services should be provided" as advanced by the Port Authority. In the PBA's view, "[t]he issues in this case are controlled by the historic obligations developed by the Port Authority through its own decision to utilize bargaining unit members to perform specified and limited work" as well as "its own decision to require its sub-lessee to perform that bargaining unit's work without negotiation[.]" It asserts that, viewed thusly, there is no basis to overturn the Appellate Division's judgment.[9]

We address those issues as follows. First, we determine the appropriate standard of review for determinations made by the Panel. Next, we consider whether the redeployment of the Port Authority police officers from the international terminal was a mandatory subject of collective bargaining at all. Finally, we

---

[9] We also received and considered post-argument submissions from the Port Authority and the PBA in respect of whether the Port Authority offered to negotiate either the redeployment of the Port Authority police officers or the effects of that redeployment. Nothing in those submissions added to the facts already in the record or to the arguments previously advanced by the parties.

discuss whether the performance of functions under the Security Plan by the international terminal's new lessee constituted the transfer of "unit work" previously performed by Port Authority police officers and, if so, whether an obligation to collectively bargain that transfer was triggered.

### III.

#### A.

The standard of review to be applied to decisions by the Panel has, to date, avoided judicial scrutiny in New Jersey.[10] As a preliminary matter, that determination requires consideration of whether the Panel qualifies as an "administrative agency." We conclude that, for purposes of judicial review, the Panel is an administrative agency. The Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to –25, defines an agency subject to its reach to include "each of the principal departments in the executive branch . . . and all boards, divisions, commissions, agencies, departments, councils, authorities, offices or officers within any such departments . . . authorized by statute to make, adopt or promulgate

---

[10] We recognize that, in addition to the unpublished decision of the Appellate Division below, two other unpublished decisions of the Appellate Division have addressed the standard of review applicable to Panel decisions; each has concluded that decisions by the Panel are to be treated as if they were issued by an administrative agency. However, we underscore that "[n]o unpublished opinion shall constitute precedent or be binding upon any court" and that "no unpublished opinion shall be cited by any court." *R.* 1:36–3. Nevertheless, we note parenthetically that each of those decisions reaches the same conclusion we endorse today in respect of the proper standard of review for Panel determinations. In its reported case law, New York has applied a deferential standard of review to Panel decisions. *See Pagano v. Port Authority,* 270 *A.D.*2d 206, 705 *N.Y.S.*2d 230 (2000) (applying standard that Panel determination "may not be disturbed since substantial evidence supports [it]"); *Pell v. Bd. of Educ.,* 34 *N.Y.*2d 222, 231, 356 *N.Y.S.*2d 833, 839, 313 *N.E.*2d 321, 325 (1974) (explaining that administrative tribunal's factual determinations are sustained if supported by substantial evidence, and exercise of discretion by administrative tribunal will be sustained "unless there is no rational basis for the exercise of discretion or the action complained of is 'arbitrary and capricious.' ").

rules or adjudicate contested cases[.]" *N.J.S.A.* 52:14B–2(a). Although the Port Authority is not constituted as or within a department of the Executive Branch of government, it is to "be regarded as performing an essential governmental function[,]" *N.J.S.A.* 32:1–35.4, including the authority to "make suitable rules and regulations[.]" *N.J.S.A.* 32:1–19.[11] Additionally, the Instruction—which created the Panel and vested it with the power to adjudicate labor disputes—was approved by the Governors of both New Jersey and New York, respectively, thereby giving it force and effect. *N.J.S.A.* 32:2–6; *N.Y. Unconsol. Laws* Ch. 151–A § 2 (2007). That Instruction authorizes the Panel to adjudicate cases. In the aggregate, then, those considerations lead to the conclusion that Panel decisions presumptively are worthy of the deference afforded decisions by administrative agencies.

Having concluded that Panel decisions are to be measured by the standard applicable to administrative agency decisions, we shift our focus to defining the appropriate standard of review to be applied. In that regard, we recently observed that "[t]he scope of [judicial] review [of administrative agency actions] is limited." *In re Herrmann*, 192 *N.J.* 19, 27, 926 *A.*2d 350 (2007) (citing *In re Carter*, 191 *N.J.* 474, 482, 924 *A.*2d 525 (2007)). We underscored that "[a]n administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." *Id.* at 27–28, 926 *A.*2d 350 (citing *Campbell v. Dep't of Civil Serv.*, 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963)). We cautioned that "[t]hree channels of inquiry inform the appellate review function:

(1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial

---

[11] *N.J.S.A.* 32:1–19 is the codification of Article XVIII of the interstate compact between New York and New Jersey dated April 30, 1921 that created the Port Authority. In contrast, New York codified the entirety of the compact creating the Port Authority—including Article XVIII—in one section. *See N.Y. Unconsol. Laws* Ch. 151 § 1 (2007).

evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[*Id.* at 28, 926 *A.*2d 350 (quoting *Mazza v. Bd. of Trs.*, 143 *N.J.* 22, 25, 667 *A.*2d 1052 (1995)).]

Thus, "[w]hen an agency's decision meets those criteria, then a court owes substantial deference to the agency's expertise and superior knowledge of a particular field." *Ibid.* (citations omitted). Judicial respect for proper administrative agency action runs deep: "Deference controls even if the court would have reached a different result in the first instance." *Ibid.* (citing *In re Taylor*, 158 *N.J.* 644, 657, 731 *A.*2d 35 (1999)).

██ That said, judicial allegiance to the actions of administrative agencies is neither unlimited nor blind. We have "emphasized that the judicial role in this kind of case must be both sensitive and circumspect[ because w]e deal here with the regulatory determination of an administrative agency that is invested by the Legislature with broad authority and wide discretion in a highly specialized area of public life." *In re Hunterdon County Bd. of Chosen Freeholders*, 116 *N.J.* 322, 328, 561 *A.*2d 597 (1989). Therefore, it is only "in situations where agency expertise is essential towards understanding the proper context of a dispute [that] a deferential standard of review is appropriate." *Ibid.*

### B.

██ The application of this standard of review informs our conclusion that the Panel's determination that "the Port Authority violated the Instruction when it transferred PBA unit work to non-unit employees without negotiating with the PBA" is not entitled to any special deference and should be rejected. This is because the Panel neither followed the law nor relied on any particularized expertise in reaching its conclusion. In specific, the same organic document that created the Panel—the Instruction— also limits its jurisdiction. In clear and explicit terms, the Instruction states that "the mission and management responsibilities

of the [Port] Authority, including its organization, staffing, planning, operating and financial policies, shall *not* be subjects of negotiation with employee organizations." (Emphasis supplied). The lease arrangement in respect of the international terminal delegated to the lessee all of the Port Authority's obligations under its lease with the City of New York and, hence, relieved the Port Authority from the day-to-day operational responsibility for that terminal. For that reason, the Port Authority's plan to lease to a private party the whole of the international terminal directly implicated "its organization, staffing, planning, operating and financial policies," a plan that, prior to its implementation, was presented to and approved by the Port Authority's Board and, by the submission and approval of its minutes, by the Governors of both New Jersey and New York. Furthermore, the Panel's decision hinged solely and exclusively on its interpretation of the lease between the Port Authority and JFKIAT, a matter that does not reside within the Panel's unique area of competence. When gauged in the aggregate, then, the Panel's determination must be rejected.

## C.

█ A like result obtains even if one concludes that the Panel did have the authority to substantively determine this matter. We agree with the unanimous determinations of the hearing officer, the Panel, the trial court and the Appellate Division that the security personnel "hired by JFKIAT ... are performing functions previously performed by Port Authority Police Officers both inside ... and in the frontage area to [the international terminal]." However, we part company with the Panel's determination that Port Authority police officer work at the international terminal was transferred to JFKIAT in a manner akin to a delegation as opposed to an outright assignment.

Relying on disparate sections of the lease between the Port Authority and JFKIAT, the Panel concluded that the security obligations at the international terminal "ha[d] not been eliminated

but rather subcontracted by the Port Authority" to JFKIAT. That conclusion simply is not supported by this record. On the contrary, the record supports the view of the hearing officer in respect of the continuing relationship between the Port Authority and JFKIAT concerning the operation of the international terminal. That is, that under the lease, the Port Authority withdrew from any further operational responsibility for that terminal. In particular, he noted that, "aside from retaining some general oversight of [the international t]erminal ... as lessor, the [Port] Authority no longer maintains and operates that facility in any cognizable sense."

### D.

Moreover, even if one concludes that the Panel had the authority to determine this controversy and that the Port Authority in fact transferred unit work to JFKIAT, the question whether the Port Authority was obligated to collectively bargain that transfer remains. We conclude that, in the circumstances presented, the Port Authority was not required to collectively bargain with the PBA the transfer to JFKIAT of the Port Authority's obligations under the Security Plan in respect of the international terminal.

■ It is well-settled that employers and employee representatives must bargain with each other in good faith in respect of "wages, hours, and other terms and conditions of employment[.]" *Nat'l Labor Relations Bd. v. Wooster Div. of Borg–Warner Corp.,* 356 *U.S.* 342, 348, 78 *S.Ct.* 718, 722, 2 *L.Ed.*2d 823, 828 (1958) (quoting Section 8(d) of the National Labor Relations Act, 29 *U.S.C.* § 158(d)). For that reason, whether an employer can "contract out" work has been determined to be "well within the literal meaning of the phrase 'terms and conditions of employment.'" *Fibreboard Paper Prods. Corp. v. Nat'l Labor Relations Bd.,* 379 *U.S.* 203, 210, 85 *S.Ct.* 398, 403, 13 *L.Ed.*2d 233, 238 (1964). That overall rule is subject to a significant limitation: "As to other matters, however, each party is free to bargain or not to bargain, and to agree or not to agree." *Nat'l Labor Relations Bd.*

*v. Wooster Div. of Borg–Warner Corp., supra,* 356 *U.S.* at 349, 78 *S.Ct.* at 722, 2 *L.Ed.*2d at 828.

 Our jurisprudence has refined that analysis. Thus, we have held that, in the context of public employment, a topic is a proper subject for negotiation "when (1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy." *In re Local 195, IFPTE,* 88 *N.J.* 393, 404, 443 *A.*2d 187 (1982). Those refinements are necessary because, "[t]o decide whether a negotiated agreement would significantly interfere with the determination of governmental policy, it is necessary to balance the interests of the public employees and the public employer." *Id.* at 404–05, 443 *A.*2d 187. Thus, "[w]hen the dominant concern is the government's managerial prerogative to determine policy, a subject may not be included in collective negotiations even though it may intimately affect employees' working conditions." *Id.* at 405, 443 *A.*2d 187. *See also, City of Jersey City v. Jersey City Police Officers Benevolent Ass'n,* 154 *N.J.* 555, 568–74, 713 *A.*2d 472 (1998) (applying *Local 195* negotiability test).

 In the line of authority developed by the Panel, the aggregate of those principles is referred to as the "*Fibreboard* plus substantial impact" test.[12] That test was developed to "balance[ ] the right of employees to engage in collective bargaining to preserve unit work against the right of the Port Authority to manage its operations." *In re an alleged Improper Practice under Section XI(A)(d) of the Port Authority Labor Relations Instruction,* 94 *PAERP* 21, at 16 (1998). In disputed matters before the Panel concerning transfers of work, once it is determined that the work at issue is "unit work" and that the unit work has been transferred from employees covered by a collective

---

[12] The Panel first developed this test in *The Lieutenant's Case,* 77 *PAERP* 6 (1978).

bargaining agreement, "[t]he test requires the Panel to perform the following four-part analysis:

1. Was there a basic alteration of the employer's operation?

2. Was there a capital investment involved, which would, if collectively bargained, significantly abridge the company's freedom to manage its business?

3. Were there issues which motivated the decision[,] such as reducing the work force, decreasing fringe benefits, and eliminating overtime payments, peculiarly suitable for resolution within the collective bargaining agreement?

4. Whether the removal of work from the bargaining unit has a significant impact upon the bargaining unit?

[*Ibid.*]

In its application, "[t]he test is straight-forward." *Ibid.* "If the answer to either of the first two questions is 'yes,' the transfer of unit work is not a mandatory subject of negotiations." *Ibid.* "On the other hand, if the answers to the first two questions are 'no,' and the answers to *both* questions 3 and 4 are 'yes,' the Port Authority must negotiate with the bargaining unit before it may transfer the work." *Id.* at 16–17. Finally, "[t]he charging party bears the burden of proving each element of this four-part framework." *Id.* at 17.

■■■ Subjecting the record before us to the *"Fibreboard* plus substantial impact" test leads to the conclusion that the transfer of the Security Plan work at the international terminal from the Port Authority to JFKIAT was not a mandatory subject of negotiations. On the first question—whether there was a basic alteration of the Port Authority's operations—the answer must be "yes." No doubt, by transferring all obligations in respect of the international terminal to JFKIAT, thereby freeing itself of the operational responsibilities for that terminal, the Port Authority indisputably altered its operations in a most basic and fundamental manner. Second, the transaction with JFKIAT involved a $1.2 billion lease agreement that required an $82 million capital investment by JFKIAT in lieu of the Port Authority itself having to replace roadways and parking at the international terminal; the Port Authority also retained a $15 million soil remediation obligation. Those facts compel the conclusion that, in the Port

Authority–to–JFKIAT lease transaction, there was a capital investment involved, which would, if collectively bargained, significantly abridge the Port Authority's freedom to manage its business.

According to the Panel's own precedent, an affirmative answer to either of the first two questions resolves the inquiry in favor of ruling that the transfer of the unit work is not a mandatory subject of negotiations. *Id.* at 16. That conclusion is buttressed further by applying the third and fourth parts of the *"Fibreboard* plus substantial impact" test. In respect of the third prong, the hearing officer found that the international terminal "was the anomaly while the [Port] Authority operated the facility." This is so because, of the nine terminals at JFK Airport, the international terminal was the sole remaining terminal operated by the Port Authority; by that point, all others had been leased to third parties. As the hearing officer succinctly described, "once operational control passed to JFKIAT, [the international terminal] became the mirror facility to the other eight unit air terminals where security and traffic control are also exclusive functions of the unit air terminal lessee/operators." Finally, the removal of the work from the PBA did not have a significant impact on the PBA. The record is clear that not one police officer lost his or her position as a result of the lease of the international terminal. The most the record contains is the unsubstantiated opinion of the Port Authority's police chief that the police officers' overtime somehow was reduced by reason of the JFKIAT lease.

In sum, we concur with the hearing officer's well-supported conclusions that

the PBA failed to satisfy its burden of establishing that the Port Authority hired, subcontracted, or permitted civilian [personnel] to perform unit work previously performed by Port Authority Police Officers at the [international terminal]. Under a sublease negotiated by the Port Authority and a consortium known as JFKIAT, the latter entity assumed operational control and management of the [international terminal]. JFKIAT was solely responsible for hiring and assigning the disputed work to the [personnel] in issue. It is not alleged nor does the record reveal that the Port Authority and JFKIAT are joint employers.

He further found that "the Port Authority's unilateral decision to sublease operational control and management of the [international terminal] to JFKIAT was not a mandatory subject of negotiations" and "that the Port Authority did not violate the work preservation provision contained in the Memorandum of Agreement or Section XI(A)(d) of the Instruction[.]" We adopt those conclusions as our own.

## IV.

The judgment of the Appellate Division is reversed, and the cause is remanded to the Law Division for the entry of an order vacating the Panel's order and dismissing the improper practice charge filed by the PBA.

Justice ALBIN, dissenting.

Until today, the Port Authority Employment Relations Panel (Panel) was widely recognized as having both the expertise and authority to determine the types of labor disputes that are subject to collective bargaining. In a thorough and thoughtful opinion supported by its own precedents, the Panel came to the unremarkable conclusion that the Port Authority of New York and New Jersey could not privatize the work of Port Authority police officers without first engaging in good faith negotiations with the officers' bargaining unit. Both management and the union delegated to the Panel the authority to resolve the very fact-sensitive labor-management dispute present in this case. The trial court and Appellate Division accorded the Panel's findings the traditional deference owed to an administrative agency. The majority has ignored that deference and substituted its own judgment to reach a different result. In doing so, and in reversing the decisions of not only the Panel but also the trial court and Appellate Division, the majority has swept aside the obligation of management—pursuant to a collective negotiations agreement—to bargain in good faith with its employees for the purpose of reaching an equitable resolution of a labor dispute. I therefore respectfully dissent.

### I.

In 1947, New York City and the Port Authority entered into an agreement (1947 Agreement) that placed what is now known as JFK Airport within the Port Authority's jurisdiction. In accordance with the 1947 Agreement, the Port Authority is required to "provide police for patrolling, for guarding and for traffic control" at JFK Airport. *In re an Alleged Improper Practice under Section XI(A)(d) of the Port Auth. Labor Relations Instruction,* 97 *PAERP* 28, at 5 (2001).

In a document entitled the Port Authority of New York and New Jersey Labor Relations Instruction (Instruction), the Port Authority and the unions servicing JFK Airport, including the Police Benevolent Association (PBA), created the Panel to resolve labor disputes arising from their collective negotiations agreements. In the Instruction, the Port Authority and the PBA delegated to the Panel the authority to make "determinations as to mandatory and non-mandatory subjects of negotiation." For over thirty years, the Panel has used its specialized expertise to develop a body of law to resolve labor disputes between the Port Authority and its union employees. The Instruction states that the Panel is not bound by either New Jersey's or New York's public sector labor laws. In accordance with the Instruction, the Panel applied its own case law to decide the dispute in this case.

That labor dispute involves an allegation that the Port Authority failed to negotiate replacing two hundred police officers—staffing the International Arrivals Building (IAB) at JFK Airport—with non-union employees. The genesis of the dispute is a long-term lease agreement between the Port Authority and private investors (JFKIAT) to construct a new IAB. The lease agreement provided that JFKIAT "shall furnish adequate security and guard service or such comparable means *as approved by the Port Authority* . . . ." (Emphasis added).

As noted, pursuant to the 1947 Agreement with New York City, the Port Authority is duty bound to provide security at JFK Airport. In view of the 1947 Agreement, no lease with a private

entity can strip the Port Authority of its non-delegable duty to furnish that security. Significantly, the Port Authority does not dispute that following its lease with JFKIAT, it remains responsible for security at the IAB, where the Port Authority's police officers perform "a variety of security functions," including traffic control in front of the IAB. *Id.* at 6–7. After the lease agreement went into effect, the Port Authority transferred PBA police officers to other areas of JFK Airport while JFKIAT hired non-union security workers in their place. The Port Authority claims that it did not have to negotiate with the PBA before making that move because "mission and management responsibilities of the [Port] Authority" are not subject to negotiations.

The Instruction by which the Port Authority must abide, however, empowers the Panel to decide which management decisions are "mission and management responsibilities." Here, the Panel focused on the following language in the collective negotiations agreement:

[T]here will be no further or additional transfer and/or reassignment of unit work currently and heretofore performed by unit employees without negotiation and all other unit work currently and heretofore performed by Police Officers shall be maintained.

. . .

All existing Police Officer positions and/or assignments shall be maintained ... so long as the work being performed continues to be performed by or on behalf of the Port Authority.

[*Id.* at 10–11.]

That language persuaded the Panel that the Port Authority was required to engage in good faith negotiations with the PBA before transferring the security functions at the IAB from police officers to non-union workers. *Id.* at 24. Ultimately, the Panel concluded that the Port Authority violated its collective negotiations agreement with the PBA by failing to do so. *Ibid.*

This Court is obliged to defer to the Panel's interpretation of the collective negotiations agreement so long as that interpretation is "reasonably debatable." *Pascack Valley Reg'l High Sch. Bd. of Educ. v. Pascack Valley Reg'l Support Staff Ass'n,* 192 *N.J.* 489, 496, 933 *A.*2d 589 (2007) (holding that in public sector labor

arbitrations " 'the scope of review in matters of interpretation is confined to determining whether the interpretation of the contractual language is reasonably debatable' " (quoting *Bd. of Educ. of Alpha v. Alpha Educ. Ass'n,* 190 *N.J.* 34, 42, 918 *A.*2d 579 (2006))). I agree with the majority that the Panel's ruling must be " 'sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.' " *Ante* at 331, 944 *A.*2d at 622 (quoting *In re Herrmann,* 192 *N.J.* 19, 27–28, 926 *A.*2d 350 (2007)). Unlike the majority, I conclude that the record soundly supports the Panel's decision.

## II.

In reaching its decision, the Panel applied its own well-established case law developed over three decades. *See* 97 *PAERP* 28, at 11 (listing numerous prior cases in which Panel articulated and applied standard). First, the Panel determined that the work now being performed by the private guards is "unit work"—that is, work that PBA officers had customarily performed at the IAB. *Id.* at 11–12. Second, the Panel found that through its lease with JFKIAT, the Port Authority continued to exercise control over the security functions at the IAB. *Id.* at 14–15. In other words, by the very terms of the IAB lease, the Port Authority did not get out of the business of providing security at the IAB. *See ibid.* In place of the police officers, the Port Authority allowed JFKIAT to hire non-union security guards. Therefore, the Panel reasoned that the Port Authority transferred unit work without first engaging in good faith negotiations with the union. *Ibid.*

The Panel then applied its own standard—a modified version of the one established in *Fibreboard Paper Products Corp. v. NLRB,* 379 *U.S.* 203, 85 *S.Ct.* 398, 13 *L.Ed.*2d 233 (1964)—a standard that the Panel has described as the *"Fibreboard* plus substantial impact test." 97 *PAERP* 28, at 20 (noting that Panel first enunciated its test in 1978 case, 77 *PAERP* 6). Under that test, the Port Authority is required to negotiate the decision to transfer unit work if:

- The Port Authority has not altered its basic operation;
- The Port Authority has not made a capital investment which, if subject to collective negotiations, would significantly abridge the Authority's freedom to manage its business;
- The issues which motivated the decision were peculiarly suitable for resolution within the collective negotiations framework; and
- The decision substantially impacts upon the wages, hours, terms and conditions of employment, either quantitatively or qualitatively.

[*Ibid.*]

First, the Panel determined that the Port Authority did not alter "its basic operation as a result of its lease arrangement with JFKIAT." *Id.* at 21. The Port Authority is obliged pursuant to its 1947 Agreement with New York City to provide security at JFK Airport—an obligation that did not change because the Port Authority entered into the lease with JFKIAT. *Id.* at 5, 21. As the Panel noted, the security work inside and outside the IAB previously performed by police officers in accordance with the 1947 Agreement was merely reassigned to non-union personnel. *Ibid.*

Second, the Panel concluded that the Port Authority did not make "a capital investment which would, if collectively negotiated, significantly abridge the Port Authority's freedom to manage its business." *Id.* at 21. The Panel reached that conclusion because the capital investment to construct a new IAB did not concern the performance of security functions at the IAB and was "irrelevant to the unit work issue in dispute." *Ibid.* Simply put, the Panel found that negotiations regarding the transfer of work to private security guards would not have impeded the capital investment. *Id.* at 21 & n. 7. In that regard, the Panel emphasized the narrowness of its ruling, noting that its decision neither required the Port Authority to negotiate with the union "over its financial arrangements under the JFKIAT lease" nor "prevent[ed] the Port Authority from deciding to have JFKIAT operate the IAB." *Id.* at 21 n. 7. Rather, the Port Authority's obligation to negotiate with the union, according to the Panel, arose out of its continuing duty to provide security inside and traffic control outside the IAB. *Ibid.* Thus, the Panel maintained that collective negotiations with the

PBA would not have "significantly abridge[d] the Port Authority's freedom to manage its business." *Id.* at 22 n. 7.

Third, the Panel found that the financial considerations motivating the Port Authority's decision to transfer the jobs of police officers to private security guards "were peculiarly suitable for resolution within the collective bargaining process." *Id.* at 22. According to the Panel, the "impact of competing wage rates" between union police officers and non-union security employees is a proper subject "for resolution within the collective negotiations framework." *Ibid.; see also ante* at 326, 944 A.2d at 619 ("It is well-settled that employers and employee representatives must bargain with each other in good faith in respect of 'wages, hours, and other terms and conditions of employment[.]'" (quoting *NLRB v. Wooster Div. of Borg–Warner Corp.,* 356 *U.S.* 342, 348, 78 *S.Ct.* 718, 722, 2 *L.Ed.*2d 823, 828 (1958))).

Last, the Panel clearly believed that lower paying non-union security jobs threatened to eventually drive down the wages of PBA police officers.[1] 97 *PAERP* 28, at 22–23. From that perspective, the Panel deduced that "the work performed by non-unit security guards rather than by Port Authority police officers ... had a substantial impact upon the wages, hours and working conditions of the PBA bargaining unit." *Id.* at 23.

Applying all of those factors in a highly fact-intensive analysis, the Panel concluded that the Port Authority had violated its Agreement with the PBA by unilaterally transferring unit work without first engaging in good faith negotiations. *Id.* at 23–24. Our Court has observed that "[q]uestions concerning whether subjects are mandatorily negotiable should be made on a case-by-case basis." *Troy v. Rutgers,* 168 *N.J.* 354, 383, 774 A.2d 476 (2001). It bears mentioning that, in its decision-making, the Panel

---

[1] It is also noteworthy that the hearing officer acknowledged that "Port Authority witnesses admitted that the redeployment of the IAB Police Officers to other terminals at JFK Airport saved the Port Authority in overall overtime payments."

has served as an honest broker, finding some Port Authority decisions to be within managerial prerogative and others subject to negotiations. *See* 97 *PAERP* 28, at 12, 13, 17–18, 19–20, 21 n. 6.

## III.

The Panel's decision simply implemented the long-held notion that management and labor should sit across the table and collectively bargain in good faith. *See Fibreboard, supra,* 379 *U.S.* at 211, 85 *S.Ct.* at 403, 13 *L.Ed.*2d at 238–39 (noting that "one of the primary purposes" of our national labor relations policy "is to promote the peaceful settlement of industrial disputes by subjecting labor-management controversies to the mediatory influence of negotiation"). That approach does not imply a pre-ordained result favoring the union.

In substituting its judgment for that of the Panel, the majority ignores that the Instruction to which the Port Authority and the PBA are bound authorizes the Panel to resolve this very dispute. The majority submits that the Panel should not have been accorded deference because it lacks the expertise to interpret a contract in the form of a lease. *Ante* at 333, 944 *A.*2d at 623. However, in exercising its jurisdiction over labor disputes, the Panel must interpret contracts of all types, including collective bargaining agreements and employment contracts. Interpreting the JFKIAT lease was integral to understanding the obligations of the Port Authority under the collective negotiations agreement with the PBA. For that reason, the Panel fulfilled its duty by considering all of the relevant documents, including the lease, to determine the Port Authority's responsibilities pursuant to the collective negotiations agreement. *Cf. Band–Age, Inc.,* 217 *N.L.R.B.* 449, 449 (1975) (interpreting lease as part of determining obligations under collective bargaining agreement), *enforced,* 534 *F.*2d 1 (1st Cir.), *cert. denied,* 429 *U.S.* 921, 97 *S.Ct.* 318, 50 *L.Ed.*2d 288 (1976).

Whether a particular employer decision is the subject of mandatory bargaining is plainly within the expertise of the Panel. Here,

the Panel made a fact-sensitive determination consistent with its own precedents. Recognizing the expertise of the Panel and the substantial deference owed its decision, both the Law Division and Appellate Division affirmed the Panel, finding that its decision was not arbitrary, capricious, or unreasonable. Indeed, the Appellate Division deemed the Panel's "findings and conclusions of law" to be "unassailable."

The majority's needless overturning of the Panel's holding that the Port Authority was required to engage in good faith negotiations with the PBA before transferring work performed by union employees to non-union employees is completely at odds with the respect our Court typically gives to administrative agencies. I agree with the trial court and Appellate Division that the Panel's decision is amply supported by the record.

For that reason, I respectfully dissent.

Justice Wallace joins in this opinion.

*For reversal and remandment*—Chief Justice RABNER and Justices LaVECCHIA, RIVERA–SOTO and HOENS—4.

*For affirmance*—Justices ALBIN and WALLACE—2.